**Howard Den MOTOYOSHI, Plaintiff**

v.

**The UNITED STATES, Defendant.**

**No. 93–784C.**

United States Court of Federal Claims.

March 31, 1995.

As Amended April 4, 1995.

---

**46**

Maris Baltins, Seattle, WA, attorney of record for plaintiff.

Thomas P. McLish, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant.

## MEMORANDUM OF DECISION

HARKINS, Senior Judge.

Howard Den Motoyoshi (plaintiff) seeks judicial review of the denial on January 14, 1993, of compensation under the Civil Liberties Act of 1988 (the Act), 50 App.U.S.C. §§ 1989b to 1989b–9, Pub.L. No. 100–383 (1988).[1] The Act is administered by the Attorney General, and after September 27, 1992, the Act authorized judicial review in this court of a denial of compensation. A denial is reviewed on the administrative record, and the court may set aside a denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Section 1989b–4(h). The case came before the court on March 24, 1995, on cross-motions for summary judgment. At the close of argument, plaintiff's motion for summary judgment was allowed; defendant's motion for summary judgment was denied; the January 14, 1993, denial of compensation was set aside; and the Attorney General was directed to award compensation in the amount of $20,000, as authorized by Section 1989b–4(a)(1).

\*　　\*　　\*　　\*　　\*　　\*

The Act implements recommendations in the report by the Commission on Wartime Relocation and Internment of Civilians (Commission) which was created in 1980 to study grievances of United States citizens of Japanese ancestry for discriminatory treatment during World War II. The Commission heard testimony from 750 witnesses, including: evacuees, government officials, citizens and historians, and reviewed archival materials possessed by the Government and universities. Perspective on the Act's restitution provisions and the facts applicable to plaintiff's claim, re-

---

**1.** Hereinafter, statutory references to the Act will be to the relevant subsection of 50 App.U.S.C. § 1989b.

quires examination of relevant background conditions.

On February 19, 1942, President Roosevelt signed Executive Order 9066. The order was issued in response to World War II hysteria following the bombing of Pearl Harbor. Although Executive Order 9066 does not refer to persons on Japanese ancestry, that is the group that the order contemplated. *Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* (1982) at 49. The order authorized the Secretary of War and military commanders to:

prescribe military areas in such places and of such extent as he or the appropriate Military commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War of the appropriate Military commander may impose in his discretion. The Secretary of War is hereby authorized to provide for residents of any such area who are excluded therefrom, such transportation, food, shelter, and other accommodations as may be necessary. . . .

Exec.Order 9066, 7 Fed.Reg. 1407 (1942).

In response to this authority, Proclamation No. 1 followed on March 2, 1942, stating that pursuant to Executive Order 9066, certain areas of the western United States (Arizona, California, Oregon, and Washington) were designated Military Zones, and that aliens and persons of Japanese ancestry would, by subsequent proclamation, be excluded. 7 Fed.Reg. 2320 (1942). Lt. Gen. DeWitt, in Proclamation No. 1 stated that these areas were "particularly subject to attack, to attempted invasion by the armed forces of nations with which the United States is now at war, and, in connection therewith, is subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations." 7 Fed.Reg. 2321 (1942). Proclamation No. 1 also imposed the requirement that aliens and persons of Japanese ancestry complete a "Change of Residence Notice" before relocating outside the Military Zone. 7 Fed.Reg. 2320 (1942). This proclamation allowed included individuals the opportunity to "voluntarily" relocate.

Plaintiff's parents were living in Santa Barbara, California, in March 1942, when Proclamation No. 1 was issued. In response, they filed the appropriate "Change of Residence Notice" and on March 26, 1942, moved from California to Denver, Colorado.

The "voluntary" evacuation period lasted a little over three weeks. At the end of March 1942, Proclamation No. 4 was issued imposing mandatory evacuation. Subsequently, approximately 120,000 citizens and permanent residents of Japanese ancestry were ordered, on short notice, to pack what they could carry, and report to assembly centers. From there, they were sent to internment camps, where many remained for over 3 years.

After plaintiff's birth, on January 2, 1943, in Denver, Colorado, his family received special permission to live in Portland, Oregon, part of the restricted Military Zone. Permission was granted to allow his father, Richard Yoshimi Motoyoshi, to work in the Foreign Broadcast Intelligence Service as a translator of Japanese propaganda broadcasts transmitted to the United States. Upon completion of that service plaintiff and his family returned to Denver.

The Commission found that there was no military necessity to justify Executive Order 9066, and the ensuing exclusion, and in fact that the internment was the result of "race prejudice, war hysteria and a failure of political leadership." *Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* (1982) at 18. There was not one documented incident of sabotage or espionage committed by a citizen or alien of Japanese ancestry. *Id.* at 3, 8. President Roosevelt had relied on the Secretary of War, Henry L. Stimson, to issue the Executive Order, who, in turn, had relied on a report by Lt. Gen. DeWitt. Lt. Gen. DeWitt's recommendation stated:

In the war in which we are now engaged racial affinities are not severed by migra-

tion. The Japanese race is an enemy race and while many second and third generation Japanese born on United States soil, possessed of United States citizenship, have become "Americanized," the racial strains are undiluted.... It, therefore, follows that along the vital Pacific Coast over 112,000 potential enemies, of Japanese extraction are at large today. There are indications that these were organized and ready for concerted action at a favorable opportunity. The very fact that no sabotage has taken place to date is a disturbing and confirming indication that such action will be taken.

*Id.* at 6.

The Commission also found that there was substantial harm and injury from the evacuation. "There was the obvious cost of homes and businesses sold or abandoned under circumstances of great distress, as well as injury to careers and professional advancement. But, most important, there was the loss of liberty and the personal stigma of suspected disloyalty for thousands of people who knew themselves to be devoted to their country's cause...." *Id.* at 3. A private firm was asked by the Commission to calculate the economic loss to the Japanese evacuees. The firm, ICF, Inc., estimated income losses to the Japanese Americans to be between $600—$900 million, not accounting for lost investment opportunities. Further, the firm found property losses sustained to total $210 million to $1.1 billion. 134 Cong.Rec. 7250 (1988).

In addition to monetary losses were the recognized liberty losses. The exclusion was imposed on all citizens and aliens of Japanese ancestry regardless of their patriotism. No one was allowed back into the Military Zones by showing their loyalty to the United States.[2] 134 Cong.Rec. 7260 (1988).

The Commission recommended remedial actions on the part of the United States Government. *Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians,* Part II (1982) at 8–10. In addition to an official governmental apology, the Commission rec-

ommended that the government establish a fund to first "provide a one-time per capita compensatory payment of $20,000 to each of the approximately 60,000 surviving persons excluded from their places of residence pursuant to Executive Order 9066." *Id.* at 9. The fund should also "sponsor research and public educational activities so that the events which were the subject of this inquiry will be remembered, and so that the causes and circumstances of this and similar events may be illuminated and understood." *Id.*

The Civil Liberties Act of 1988 implements the recommendations of the Commission to apologize for the evacuation, relocation, and internment of United States citizens of Japanese ancestry:

The Congress recognizes that ... a grave injustice was done to both citizens and permanent resident aliens of Japanese ancestry by the evacuation, relocation, and internment of civilians during World War II.... The excluded individuals of Japanese ancestry suffered enormous damages, both material and intangible, and there were incalculable losses in education and job training, all of which resulted in significant human suffering for which appropriate compensation has not been made. For these fundamental violations of the basic civil liberties and constitutional rights of these individuals of Japanese ancestry, the Congress apologizes on behalf of the Nation.

Section 1989a(a).

The Act also implements the Commission's recommendation that a token $20,000 restitution be paid to individuals excluded from their places of residence. Section 1989b–4(a)(1). Individuals are eligible for payment under the Act if the individual (1) is of Japanese ancestry and was alive at the date of its enactment, August 10, 1988, (2) was a United States Citizen or a permanent resident alien between December 7, 1941, and June 30, 1946, and (3) was confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of Executive Order No. 9066 or other law or directive of the Armed

---

**2.** Loyalty reviews were used to allow some individuals to leave the relocation centers, but those

persons were still not allowed to enter the Military Zones. 134 Cong.Rec. 7260 (1988).

Forces of the United States relating to the evacuation of individuals of Japanese ancestry between December 7, 1941, and June 30, 1946, or (4) was enrolled on the records of the United States Government as being in a prohibited military zone between December 7, 1941, and June 30, 1946. Section 1989b–7(2).

The Attorney General's responsibilities under the Act have been delegated to the Assistant Attorney General, Civil Rights Division, and are administered by the Office of Redress Administration (ORA). ORA by regulation is responsible to identify, locate, and make payment to persons eligible for compensation. Those found ineligible may petition the Assistant Attorney General, Civil Rights Division, for reconsideration. 28 C.F.R. § 74.15.

Plaintiff's father was found to be an eligible individual under the Act in 1992, and has received $20,000 as restitution. Plaintiff's mother died before the Act became law. In 1992, plaintiff filed an ORA Special Verification Declaration Form seeking restitution under the Civil Liberties Act. The ORA denied plaintiff's application on July 21, 1992. In letters dated August 31, 1992, and November 11, 1992, plaintiff requested reconsideration of ORA's denial. The Assistant Attorney General's delegate on January 14, 1983, denied plaintiff's request.

*Discussion*

This case is before the Court on cross-motions for summary judgment. Summary judgment is proper where there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden to demonstrate that there are no genuine issues of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), then the burden shifts to the non-movant to produce affirmative evidence that a genuine issue of material fact does exist. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). Where both parties move for summary judgment, the court must evaluate the merits of each mo-

tion individually, making separate inquiries of whether any facts in dispute are material to each claim. *Mingus Constr., Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). All reasonable inferences must be drawn against the party whose motion is under consideration. *Id.*

Plaintiff contends that the return of his family from Portland, Oregon, to Denver, Colorado, after completion of work for the Foreign Broadcast Intelligence Service, qualifies as relocation under the Act; and that, notwithstanding his birth in Denver after his parents had "voluntarily" relocated, he was "otherwise deprived of liberty or property" within the meaning of the Act. Either a relocation or a deprivation of liberty would entitle plaintiff to compensation.

Defendant argues that plaintiff is not entitled to recover because (1) the administrative record contains no evidence to establish a relocation from Portland to Denver, and (2) he was not "otherwise deprived of liberty" within the meaning of the Act because the ORA "regulations do not include as eligible children born after their parents had voluntarily relocated from prohibited military zones" (54 Fed.Reg. 34160, Aug. 18, 1989) and deference is owed the agency's interpretation of the statute.

The presence of communications in the administrative record is a question of fact. There is no dispute that plaintiff was in Portland during the period December 7, 1941, to June 30, 1946, or that he moved from Portland to Denver during that period. There is no agreement, however, as to the precise dates he and his family were in Portland or whether the members of the family left Portland at the same time. The facts in dispute are not material to the issues of law.

Plaintiff claims that the regulations, as applied, do not effectuate the intent of the statute. Defendant urges deference to the agency decision. Defendant asserts the regulations are supported by the statute, and were applied correctly. The same issue is in question in each motion and the same facts are relevant. Both parties agree that plaintiff satisfies the threshold requirements to be an eligible individual under the Act; plaintiff

is of Japanese ancestry, plaintiff was alive when the Act became law, and plaintiff was a United States citizen during the evacuation, relocation and internment period. The legal issue is whether plaintiff fulfills the final eligibility requirement under the Act: was plaintiff "confined, held in custody, relocated, or otherwise deprived of liberty or property." Section 1989b–7(2)(B)(i). Disposition of the legal issue by summary judgment pursuant to procedures that apply to a review of a decision on the basis of an administrative record is appropriate. RCFC 56.1.

The Attorney General is responsible for identifying and notifying all eligible individuals under the Act. Section 1989b–4(a). A definition of eligibility is provided in Section 1989b–7(2), that section of the Act also has been implemented by regulation. 28 C.F.R. §§ 74.1–74.4. The regulations in 28 C.F.R. § 74.3(b) provide examples of specific inclusions [3] and exclusions.[4] The regulations state, however, that "[p]aragraph (b) of this section is not an exhaustive list of individuals who are deemed eligible for compensation; there may be other individuals determined to be eligible under the Act on a case-by-case basis by the Redress Administrator." 28 C.F.R. § 74.3(c).

When this court engages in record review of agency decisions, it is not empowered to substitute its judgment for that of the agency and the agency construction need not be the only reasonable one that the reviewing court would have reached. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167–68, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Rather, "the judicial function is exhausted when there is found to be a rational basis for the [administrative] conclusions." *Nabisco, Inc. v. United States,* 599 F.2d 415, 220 Ct.Cl. 332, 340 (1979), *quoting Port Authority of St. Paul v. United States,* 432 F.2d 455, 193 Ct.Cl. 108, 120 (1970). This court recognizes that the agency's decision is entitled to substantial deference. *Doty v. United States,* 24 Cl.Ct. 615, 626–27 (1991).

■ Although an agency's decision is entitled to substantial deference, a court "should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). In reviewing ORA's construction of the Act, we must first look to whether Congress has spoken directly to the precise questions at issue. If we determine that the language of the Act is unambiguous and that the intent of Congress is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). *See Skinner v. Brown,* 27 F.3d 1571, 1572–73, 1575–76 (Fed.Cir.1994).

Plaintiff's entitlement to the reparation amount may be founded either on: (1) whether he was "confined, held in custody or relocated" as a result of Executive Order 9066; or, (2) whether he was "otherwise deprived of liberty" as a result of Executive Order 9066.

(1) At some time during the war, plaintiff moved from Denver, Colorado, with his family to Portland, Oregon. Defendant does not refute that plaintiff lived there, only that the exact dates that his family lived there are uncertain. It was clearly during the war because his father's position was to translate intercepted Japanese propaganda. When the position ended, the family returned to Denver. It is unclear whether plaintiff and his mother left earlier than his father. What is known is that at some time, the family lived in Portland, and then returned to Denver. Plaintiff states that because the family was forced to leave Portland, part of the Military Zone, and return to Denver, he was relocated. To this, Defendant argues lack of

---

**3.** The regulations contain a list of eight specific examples of individuals who would be considered eligible. 28 C.F.R. § 74.3(b). For example, individuals who were born in assembly centers, relocation camps or internment centers are deemed to be eligible. 28 C.F.R. § 74.3(b)(7).

**4.** Individuals who relocated, between December 7, 1941, and September 2, 1945, to a country with which the United States was at war, are ineligible even if they would otherwise fit the definition. 28 C.F.R. § 74.4.

proof that plaintiff was "forced" to leave Portland. Clearly, Portland, Oregon was within the Military Zone, and thus, plaintiff, being a citizen of Japanese ancestry was not allowed to be in this exclusion area. *See* Proclamation No. 1, 7 Fed.Reg. 2320 (1942); 133 Cong.Rec. 28163 (Oct. 15, 1987) (Remarks of Sen. Matsui).

The administrative record contains evidence sufficient to give ORA notice of the elements in plaintiff's relocation claim. The October 17, 1988, application of Richard Yoshimi Motoyoshi, plaintiff's father, for restitution (provided to ORA by plaintiff on May 30, 1992) describes his work in Portland for the War Department Foreign Broadcast Intelligence Service and explains why he (and presumably his family) was allowed residence in Portland. ORA in its July 21, 1992, review stated:

> Under the regulations, eligible persons include those who have suffered losses as a result of actions taken *by or on behalf of the United States Government*, with respect to the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry. A review of the available information in your case indicates that your losses were not the result of government action as defined in the Act and the implementing regulations. Therefore, we must conclude that you are not eligible to receive compensation. [Emphasis in original.]

Plaintiff's initial request for reconsideration on August 31, 1992, admitted he had not been "directly confined, held in custody, or relocated." This admission was corrected in his further submission on November 17, 1992. Plaintiff made it clear he was relocated from Portland to Denver. The letter states:

> Another factor to consider is the period of time that my parents and I had spent in Portland, Oregon while my father was in the service of the U.S. government as a member of the Foreign Broadcast Intelligence Service. Due to his fluency in both the English and Japanese languages, he was recruited and he accepted a position to work for the U.S. government in this unit. The duty of this unit was to intercept broadcasts from Japan and translate these for the U.S. government.
>
> My father has not talked much about this period in his life although he has mentioned and family photographs attest to fact that we lived in Portland as a family for a short period of time. We must have had special clearance to live in this excluded zone while my father was working with the Foreign Broadcast Intelligence Service. Though we had this special clearance, I'm sure that we were not free to go anywhere we wanted and even if we could, racial prejudice and war hysteria limited our movement in this coastal city. The situation was such that my mother moved back to Colorado with me while my father continued his work with the Foreign Broadcast Intelligence Unit in Portland. My father soon quit his position with the government when he was asked to transfer to Hawaii but would not be able to take his family with him.

The Civil Rights Division, in its January 14, 1993, denial of reconsideration, however, notwithstanding that the communications in the administrative record presented the matter for consideration, did not address the issue of a relocation from Portland to Denver. The letter states:

> I understand that your family, departed Santa Barbara, California, which had become a restricted area, in March, 1942, and relocated to Denver, Colorado before you were born. You acknowledge, and ORA confirms, that you were born in Denver on January 2, 1943.

Under the regulations implementing the Act, children that were "born in assembly centers, relocation camps and internment camps" are eligible for redress compensation. 28 C.F.R. 74.3(b)(7); 54 Fed.Reg. 34157, 34160 (August 18, 1989). However, the regulations "do not include as eligible children born after their parents had voluntarily relocated from prohibited military zones or from assembly centers, relocation camps, or internment camps." 54 Fed. Reg. at 34160. Therefore, because you were born after your parents relocated from a prohibited military zone, you were not an "individual * * * confined, held in

custody [or] relocated" within the meaning of the Act. 50 U.S.C.App. 1989b–7(2)(b). Thus, I cannot set aside ORA's decision.

■ Defendant's failure to consider and determine plaintiff's eligibility for compensation because of relocation from Portland to Denver on the basis of the administrative record before it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Plaintiff was relocated as a result of Executive Order 9066, and is eligible for restitution under the Civil Liberties Act of 1988.

(2) On the second ground of eligibility for reparations, deprivation of liberty or property by reason of Executive Order 9066, plaintiff contends the Act by its terms specifically applies to his situation. Plaintiff also asserts that he is an eligible individual under the Act because Congress evinced its intention that the statute be applied broadly by including a fourth "catchall" category "otherwise deprived of liberty" in its definition of eligibility. Section 1989b–7(2).

Plaintiff's argument is not new. The plaintiffs in *Ishida v. United States,* 31 Fed.Cl. 280 (1994); *Consolo v. United States,* 31 Fed. Cl. 447 (1994); and *Tanihara v. United States,* 32 Fed.Cl. 805 (1995), also used deprivation of liberty as a basis of a claim for compensation. The dispositive legal issue in all three cases is identical and is identical to the dispositive legal issue in this case. *Ishida* and *Tanihara* upheld denial of compensation; *Consolo* found entitlement to compensation and set aside the decision of the Attorney General. Both *Ishida* and *Tanihara* gave deference to ORA's administrative action; *Consolo* found ORA's interpretation was contrary to the plain and unambiguous language of the Act.

The facts in all three cases are similar to those in plaintiff's claim. The plaintiff in *Consolo* was born in Fielding, Utah eleven months after her parents "voluntarily" relocated from Los Angeles, California. Plaintiff was denied compensation under the Civil Liberties Act by the Assistant Attorney General for the same reason given to the plaintiff. 31 Fed.Cl. at 449. The plaintiff in *Tanihara* was born in Chicago in June 1944,

after her parents were ordered to evacuate their home in Los Angeles, relocated for 3 years in a camp in Jerome, Arkansas, and granted indefinite leave to live in Chicago. In *Ishida* plaintiff was born on November 23, 1942, in Marion, Ohio, after his parents "voluntarily" evacuated from Fresno, California, in February 1942, and relocated in Marion. Denial of compensation under the Act by the Assistant Attorney General was for the same reason given to plaintiff. 31 Fed.Cl. at 284.

In *Consolo,* the court reasoned that because a child's domicile is that of its parents, plaintiff's domicile was California, and because plaintiff was born during the evacuation, relocation, and internment period, she was not allowed to return at that time to California and was therefore, excluded from her place of domicile. The court held that by excluding plaintiff from her place of domicile, the government, enforcing the laws implementing Executive Order 9066, deprived plaintiff of her liberty, and therefore, she was eligible for restitution under the Civil Liberties Act. The analysis in *Consolo* equally applies to plaintiff's deprivation of liberty claim in this case.

Defendant argues that the Act does not specifically address whether individuals born after their parents had voluntarily relocated from prohibited military zones are eligible for compensation. Defendant also contends the Act does not explicitly define whether such individuals were "otherwise deprived of liberty or property". ORA's regulation that does not include as eligible children born after their parents had voluntarily relocated from a prohibited military zone, accordingly, is viewed by defendant as a reasonable application of its authority to issue regulations that cannot be disturbed unless it contravenes clearly discernable legislative intent, citing *DeCosta v. United States,* 987 F.2d 1556, 1558 (Fed.Cir.1993).

Defendant bolsters its argument that the regulation is reasonable by reference to the failure of the 1992 Amendments to address this issue while at the same time expanding coverage to internees not of Japanese ancestry who were interned along with their spouses and children. Such extension of coverage was the product of ORA's early deci-

sion to submit legislation to amend the Act so as to render eligible non-Japanese family members who had been interned. *See* 54 Fed.Reg. 34156, Aug. 18, 1989. This extension of eligibility in no way indicates that Congress was satisfied with ORA's determination that individuals born after their parents had voluntarily relocated were not eligible for compensation.

The error in ORA's interpretation, which is fatal to defendant's argument, is that it results in rendering the phrase "or otherwise deprived of liberty" without function in the Act. Basic rules of statutory construction demand, unless the meaning is otherwise clearly expressed, an interpretation that gives effect to all the Act's terms and avoids rendering any part of the statute superfluous. Further a construction that gives meaning to the words "otherwise deprived of liberty" would implement the direction in the 1992 Amendments to give the benefit of the doubt to an individual requesting restitution.[5]

The plain and unambiguous language of the Act does include as eligible those individuals who have been deprived of liberty or property as a result of the laws and orders which caused the evacuation, relocation, or internment of individuals of Japanese ancestry, as well as those individuals confined, held in custody, or relocated. The Act ensures that those individuals of Japanese ancestry who were "deprived of liberty" will be compensated even though they were not confined, held in custody, or relocated. The Act provides compensation for individuals excluded from their domicile as a result of the government actions.

It is obvious that a person of Japanese ancestry, such as plaintiff, who was born after his parents relocated, was deprived of liberty under the Act. The only interpretation of the category "otherwise deprived of liberty" that is reasonable is that it was meant to be broadly applied. Defendant in this case, and the decisions denying relief to plaintiffs situated similarly to this plaintiff, have not given any plausible explanation as to what this phrase otherwise could mean. It cannot be interpreted simply to include other individuals who were "confined, held in custody, [or] relocated" because those individuals are covered in the specific wording of the statute.

During the entirety of World War II, aliens and citizens of Japanese ancestry were discriminated against and suffered harm. People such as plaintiff's parents were forced to sell most of their belongings, their homes and businesses in a very short time.[6] Restrictions on normal living patterns were severe and property losses of these individuals undeniably were great. They were sent to States where the citizens did not want them. The same hysteria that prompted Executive Order 9066 infected much of society at the time. *See Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* (1982) at 95–104. Plaintiff undoubtedly felt the effects of Executive Order 9066. He could not return to the domicile of his parents and he could not reside in the exclusion zone. Plaintiff's liberty and property interests were diminished and he certainly suffered discrimination due to the effects of Executive Order 9066.

Allowing a claim in this situation, to those who were born after their parents relocated from the Military Zones, would not open the door to virtually any person of Japanese ancestry living in the United States during the 1940's, to seek compensation. It is still

---

5. Section 1989b–4(a)(3) provides:

**(3) Benefit of the doubt**

When, after consideration of all evidence and relevant material for determining whether an individual is an eligible individual, there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility, the benefit of the doubt in resolving each such issue shall be given to such individual.

6. An observer during the evacuation period noted "I witnessed unscrupulous vultures in the form of human beings taking advantage of bewildered housewives whose husbands had been rounded up by the F.B.I. within the 48 hours after Pearl Harbor. They were offered pittances for practically new furniture and appliances: refrigerators, radios consoles, etc., as well as cars, and many were falling prey to these people." *Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* (1982) at 108–09.

54

the requirement of the Act that each individual show he or she was "otherwise deprived of liberty." Someone born in an area outside the exclusion zone, who did not have a domicile in California, could not be said to be deprived of liberty and freedom in a magnitude comparable to that of a person who was unable to return to his domicile.

Plaintiff was "otherwise deprived of liberty" as a result of Executive Order 9066, and is eligible for restitution under the Civil Liberties Act of 1988.

*Conclusion*

On the basis of the foregoing, plaintiff's motion for summary judgment was allowed and defendant's motion for summary judgment was denied. The January 14, 1993, denial of reconsideration of ORA's denial of compensation is set aside. The Attorney General is directed to award compensation in the amount of $20,000, as specified in 50 App.U.S.C. § 1989–4(a)(1). Costs to plaintiff.