**Emiko KANEKO**

v.

**The UNITED STATES.**

No. 94–1017C.

United States Court of Federal Claims.

July 16, 1996.

Gerald M. Sato, Ventura, California, for plaintiff.

Paul S. Padda, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

YOCK, Judge.

This claim for restitution under the Civil Liberties Act of 1988 ("Civil Liberties Act"), 50 U.S.C.App. § 1989b, *et seq.* (1994), comes before the Court on the parties' cross-motions for summary judgment. The plaintiff, Mrs. Emiko Kaneko, challenges the decision of the United States Department of Justice, Office of Redress Administration ("ORA"), denying her claim for restitution under the Civil Liberties Act as a result of losses experienced by her husband, Mr. Satoro Kaneko, as a Japanese resident alien during World War II. The defendant counters that the losses experienced by Mr. Kaneko during World War II were either the result of actions by purely private entities or are otherwise not cognizable under the Civil Liberties Act, and, as a result, Mr. Kaneko was not an "eligible individual" for restitution under the Act.

For the reasons stated herein, the defendant's cross-motion for summary judgment is granted, the plaintiff's motion for summary judgment is denied, and the plaintiff's Complaint is to be dismissed.

### Statement of Facts

Mr. Kaneko emigrated to the United States from Japan in the early 20th century. Subsequently, on April 27, 1915, he found employment with the Southern Pacific Railroad in Beppo, Utah. In March of 1917, Mr. Kaneko was transferred to Southern Pacific Railroad's Salt Lake Division/Ogden District. In April of 1937, Mr. Kaneko married the plaintiff, Mrs. Emiko Kaneko, a native-born

citizen of the United States. Eventually, Southern Pacific promoted Mr. Kaneko to the position of Track Foreman, a position in which he earned approximately $150 per month. Southern Pacific also provided the Kanekos with housing in Ogden, Utah, as part of Mr. Kaneko's employment.

At the start of World War II, by order of the President, the bank accounts and other properties held by Italian, German, and Japanese nationals residing in this country were seized under the authority of the Trading With the Enemy Act ("TWEA"), 50 U.S.C.App. § 5(b)(1) (1994), which allows the President to regulate any property in which a foreign national has an interest.[1] Pursuant to the TWEA, Mr. Kaneko's bank account with the Commercial Bank of Ogden was frozen by order of the Federal Government.

Moreover, after the commencement of World War II in December of 1941, the mood of the country towards aliens from Italy, Germany, and particularly Japan became increasingly malevolent. As a result, many employers, especially those in defense-related industries, became wary of continuing to employ persons with ancestry from enemy countries. Certain departments of the Federal Government attempted to quell this tide of suspicion in the weeks after the war began. For instance, a memorandum dated December 8, 1941, addressed to the office of the president of Burlington Railroad, memorialized a conversation between an official with the Railroad and an agent with the Federal Bureau of Investigations ("FBI") by the name of Mr. Norton. The memorandum notes that the Burlington official requested Government instruction regarding Burlington's Japanese employees. The memorandum recounts that Agent Norton replied: "the only instructions that I could give you would be to watch them to see that the Japanese employees do not leave the vicinity of their employment and do not get into any bombings or other sabotage." Administra-

tive Record ("AR") at 19. Subsequently, on December 10, 1941, the Headquarters Seventh Corps Area, Office of Assistant Chief of Staff for Military Intelligence, advised the president of another railroad, Union Pacific, to "not dismiss Japanese, but place [them] under careful observation on work where opportunity for sabotage is small or negligible * * *." AR at 20. Finally, on December 28, 1941, Attorney General Biddle publicly urged employers not to dismiss their Japanese employees:

> [I]t is the stated policy of the Federal Government that there shall be no discrimination in the employment of workers in defense industries because of race, creed, color or national origin. * * * There is no reason in the world why loyal persons, either aliens or immigrants of foreign birth, should not be employed by American industry; and there is no possible justification for discharging such employes [sic]. The Federal Government condemns such discrimination and urges all employers not to adopt such a policy.

AR at 21–22.

Despite these pronouncements by high-level Federal Government officials, many private employers began to dismiss large numbers of Japanese workers. On February 18, 1942, the Southern Pacific Railroad terminated Mr. Kaneko and 38 other Japanese employees from their employment. One of Southern Pacific's documents, created after the decision to terminate the 39 Japanese employees, indicates that the decision to dismiss the employees was possibly the result of a directive from the Federal Government. A memorandum authored by a Southern Pacific official named Mr. Sines, relating to the dismissal of Mr. Chohachi Fujita, a Japanese worker dismissed with Mr. Kaneko, states that Mr. Fujita was "[r]emoved from service by Govt. Order account being a Japanese

---

1. The TWEA states in pertinent part:

(b)(1) During the time of war, the President may, through any agency that he may designate, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise * * *

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation * * * with respect to * * * any property in which any foreign country or a national thereof has any interest * * *.

Alien." Pl's App. at 1 [2] (the "Sines memo"). A second recently-created document also could be seen as corroborating the information in the Sines memo. On December 14, 1990, in response to the ORA's request to Southern Pacific for information concerning the dismissal of Mr. Inouye, another Japanese employee dismissed at the same time as Mr. Kaneko, Mr. Kenneth Wood of Southern Pacific recounted that indeed Mr. Inouye had been dismissed from Southern Pacific, and his dismissal was "evidently in accordance with instructions rendered by the federal government." Pl's App. at 2. Later, however, upon being questioned by the ORA, Mr. Wood admitted that in fact he did not know the reason for Southern Pacific's decision to terminate its Japanese employees in 1942, and that he had only speculated that it was the result of direction by the Federal Government. AR at 2.

On February 19, 1942, President Franklin D. Roosevelt signed Executive Order No. 9066. Executive Order No. 9066 directed the Secretary of War and his designated military commanders to prescribe military areas "with respect to which, the right of any person to enter, remain in, or leave subject to whatsoever the Secretary of War or the appropriate Military Commander may impose in his discretion." 7 Fed.Reg. 1407 (1942). Pursuant to Executive Order No. 9066, Lt. Gen. John DeWitt issued a series of Public Proclamations effectively creating two sets of regimes for the Western States—one, for the states directly on the west coast—California, Oregon, and Washington—and a second for states such as Arizona, Nevada, and Utah. On March 2, 1942, General DeWitt issued Public Proclamation No. 1, which designated much of the states comprising the west coast as military areas and mandating the exclusion of persons of Japanese ancestry from this region. Subsequently, General DeWitt issued Public Proclamation No. 4, "whereby persons of Japanese ancestry were prohibited from leaving parts of the West Coast because the Government was preparing to forcibly relocate them later." 54 Fed.Reg. 34,157, 34,159 (Aug. 18, 1989). These Public Proclamations and other orders embodied and implemented the evacuation, relocation, and internment program for those individuals of Japanese ancestry located on the west coast. However, only individuals of Japanese ancestry residing in the states directly on the west coast were subject to these orders. On March 16, 1942, General DeWitt also issued Public Proclamation No. 2, which designated Idaho, Montana, Nevada, and Utah as military areas. However, unlike Public Proclamation Nos. 1 and 4, which essentially proscribed the free movement of persons of Japanese ancestry throughout the west coast, Public Proclamation No. 2 simply created within these states various "zones" within which any person of Japanese ancestry could not be physically present. AR 34. The vast majority of these "zones" were transportation facilities, including some, but not all, of Southern Pacific's properties, such as its tunnels, bridges, and trestles in Utah and Nevada. Finally, in an act that effectively validated these Public Proclamations and Executive Order No. 9066, Congress enacted 56 Stat. 173 on March 21, 1942, making criminal any violations of orders or proclamations issued pursuant to Executive Order No. 9066.

In recognition of the human rights violations by the Federal Government as a result of the evacuation, relocation, and internment of its Japanese citizens and resident aliens during World War II, Congress passed the Civil Liberties Act of 1988, 50 U.S.C.App. § 1989b *et seq.* (1994). The Act provides, among other things, for the payment of $20,-000 in restitution to each "eligible individual." 50 U.S.C.App. § 1989b–4 (1994). The Act later defines an "eligible individual" as, *inter alia,* any individual of Japanese ancestry alive at the time the Act was passed and who was "confined, held in custody, relocated, or otherwise deprived of property or liberty" as a result of Executive Order No. 9066, 56 Stat. 173, or any other executive or military orders "respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry." 50 U.S.C.App. § 1989b–7(2) (1994). Under the Act, the Attorney General is responsible for identifying, locating, and paying eligible individuals. 50

---

**2.** References to the Appendix attached to the Plaintiff's Motion for Summary Judgment, filed on Sept. 29, 1995, will be referred to as "Pl's App. at ——."

U.S.C.App. §§ 1989b–4(a), (b) (1994). The Attorney General has delegated this authority to the ORA. If the ORA determines that an individual is ineligible for compensation, that person may seek reconsideration of the decision from the Assistant Attorney General for the Civil Rights Division. A claimant may then appeal any adverse decision by the Assistant Attorney General for the Civil Rights Division to the United States Court of Federal Claims. 50 U.S.C.App. § 1989b–4(h) (1994).

Sometime in late 1989, Mr. Kaneko was contacted by the ORA as a possible individual eligible for the recovery of restitution under the Civil Liberties Act. On December 11, 1989, Mr. Kaneko submitted a voluntary information form detailing the nature of his losses during World War II to the ORA for review. On March 13, 1990, the ORA responded to Mr. Kaneko's submission by stating that it did not seem that he came within any of the categories of individuals eligible for restitution under the Act. However, the ORA offered Mr. Kaneko the opportunity to supplement the record to illustrate that he was eligible for restitution under the Civil Liberties Act. Mr. Kaneko responded on April 11, 1990, by explaining that he believed he was entitled to restitution because he had been dismissed from his position with the Southern Pacific Railroad and that his bank account had been frozen by order of the Government at the start of the war. On November 6, 1991, the ORA denied Mr. Kaneko's claim. AR 85. Specifically, the ORA found that there was no evidence that Mr. Kaneko's dismissal from the Southern Pacific Railroad was the result of Federal Government action—a prerequisite to recovery under the Civil Liberties Act. Rather, the ORA found that the decision to terminate Mr. Kaneko, and the other Japanese employees of the Southern Pacific Railroad, was made solely by the Southern Pacific Railroad as a private entity and not at the direction or order of the Federal Government. AR 85–86. Second, the ORA pointed out that Utah, unlike California, never became a military

zone, requiring the evacuation, relocation, and internment of Japanese. Rather, persons of Japanese ancestry were merely prohibited from entering certain areas designated as "military zones." However, only a portion of Southern Pacific's property was included within these military zones. Thus, it could not be argued that the actions of the Federal Government prohibited Mr. Kaneko from working for Southern Pacific. AR 85–86. Moreover, these areas did not become military zones by order of the Federal Government until *after* Mr. Kaneko was dismissed from the Southern Pacific Railroad. Finally, the ORA noted that the freezing of Mr. Kaneko's bank account was not an action taken with respect to the "evacuation, relocation, or internment" of individuals on the basis of their Japanese ancestry, as required by the Civil Liberties Act. AR 85–86. On January 2, 1991, Mrs. Kaneko appealed the ORA's decision denying her husband restitution.[3] On May 2, 1992, Mr. David K. Flynn, Chief of the Appellate Section of the Department of Justice's Civil Rights Division, remanded the case back to the ORA after he became aware of and reviewed the Sines memo regarding Mr. Fujita. On remand, the ORA again found that Mr. Kaneko was not an eligible individual under the Act in a decision dated January 12, 1993. On January 15, 1993, Mrs. Kaneko was deemed to have filed an appeal of the ORA's second decision. Finally, on September 7, 1994, Mr. Flynn denied Mrs. Kaneko's appeal of the ORA's adverse decision. AR at 150–51.

On November 21, 1994, the plaintiff filed the present Complaint with this Court. In her Complaint, the plaintiff maintains that there was substantial evidence that her husband's dismissal from the Southern Pacific Railroad was directed by the Federal Government and that the Federal Government's decision to freeze Mr. Kaneko's bank account makes him eligible for restitution under the Civil Liberties Act. Subsequently, on September 29, 1995, the plaintiff filed the present motion for summary judgment. The de-

---

**3.** Mr. Kaneko died during the pendency of his claim. Under the terms of the Civil Liberties Act, the widow of a claimant has standing to prosecute a claim under the Civil Liberties Act if the deceased spouse was alive at the time the Act was passed. 50 U.S.C.App. §§ 1989b–4(a)(8)(A)(i), (a)(8)(B) and (a)(8)(C)(i) (1994).

fendant responded on February 29, 1996, by filing an opposition to the plaintiff's motion for summary judgment and its own cross-motion for summary judgment.

### Discussion

In her motion for summary judgment, the plaintiff argues that there are three bases for the plaintiff to recover restitution under the Civil Liberties Act. First, the plaintiff maintains that there is substantial evidence that Mr. Kaneko's dismissal from Southern Pacific was ordered by the Federal Government. Next, the plaintiff posits that the record indicates that, as a result of the Government's and the military's directives prohibiting Japanese from certain military zones in Utah and other Western States, the Southern Pacific Railroad was precluded from rehiring Mr. Kaneko. The plaintiff maintains that such a loss qualifies Mr. Kaneko as an "eligible individual" under the Civil Liberties Act. Finally, the plaintiff contends that the Federal Government's decision to freeze Mr. Kaneko's bank account was a "deprivation of property" qualifying Mr. Kaneko for restitution under the Civil Liberties Act.

The defendant responds in its cross-motion for summary judgment that, contrary to the plaintiff's protestations, substantial evidence indicates that the decision to terminate Mr. Kaneko, and the other Japanese workers, was made solely by the Southern Pacific Railroad as a private entity. The defendant proffers that the Federal Government's position at the time of Mr. Kaneko's dismissal was precisely the opposite of that currently ascribed to it by the plaintiff—that the Federal Government actually advised private employers against dismissing their employees of Japanese ancestry. Second, the defendant responds that even if it could be argued that the Federal Government did order the dismissal of Mr. Kaneko, he would still not be eligible for redress under the Civil Liberties Act. This is because, according to the defendant, the Civil Liberties Act requires that a claimant's loss be the result not only of Government action, but of Government action "respecting the evacuation, relocation, or internment of individuals * * * of Japanese ancestry * * *." 50 U.S.C.App. § 1989b-

7(2)(B)(i)(III) (1994). However, the defendant notes that Mr. Kaneko was dismissed on February 18, 1942, prior to the initiation of the evacuation, relocation, and internment program through Executive Order No. 9066 and Public Proclamation No. 1. Finally, the defendant argues that the Federal Government's seizure of Mr. Kaneko's bank account does not qualify Mr. Kaneko for compensation because the seizure was accomplished pursuant to the Trading With the Enemy Act, 50 U.S.C.App. § 5 (1994), not the evacuation, relocation, and internment program, as required by the Civil Liberties Act.

 Summary judgment is properly granted when there are no genuine issues of material fact, RCFC 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986), and the movant is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Where both parties have moved for summary judgment, each party's motion must be evaluated on its own merits, drawing all reasonable inferences against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). Finally, if the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue, and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corporation*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The Civil Liberties Act itself stipulates the standard that this Court is required to apply in its review of the Assistant Attorney General's decisions denying compensation. Specifically, this Court shall set aside a decision only if the denial "is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 50 U.S.C.App. § 1989b–4(h)(1) (1994); *see also Suzuki v. United States*, 29 Fed.Cl. 688, 691 (1993). In addition, this Court is limited to the administrative record when reviewing any adverse decision. 50 U.S.C.App. § 1989b–4(h)(1) (1994).

The Civil Liberties Act provides for restitution to persons of Japanese ancestry impacted by the evacuation, relocation, and in-

ternment program implemented by the Federal Government during World War II. It is well settled, however, that recovery under the Act is not limited solely to those individuals that were actually evacuated, interned, or relocated. Those who were deprived of property or liberty as a result of the orders respecting the evacuation, internment, and relocation program are similarly eligible to recover restitution under the Act. *Ishida v. United States,* 59 F.3d 1224, 1230 (Fed.Cir.1995); *Motoyoshi v. United States,* 33 Fed.Cl. 45, 53 (1995). Accordingly, there are five classes of "eligible individuals" under the Civil Liberties Act: (1) those who were interned, (2) those who were relocated, (3) those who were evacuated, (4) those who were deprived of property, and (5) those who were deprived of liberty. However, in order to be eligible for restitution these five injuries must have been the result of specified Government action; namely, Executive Order No. 9066, 53 Stat. 173, or other executive or military proclamations "respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry * * *." 50 U.S.C.App. § 1989b–7(2) (1994); *Ishida,* 59 F.3d at 1230. To recover under the Civil Liberties Act then, an individual's losses must be the result of Federal Government action relating to the evacuation, relocation, and internment program as implemented through the enumerated executive and military directives.

In the instant case, the plaintiff avers three bases for recovery under the Civil Liberties Act: (1) her husband's dismissal from the Southern Pacific Railroad, (2) her husband's inability to be re-employed by Southern Pacific during the course of World War II, and (3) the seizure of her husband's bank account by the Federal Government. However, for the various reasons explained *infra,* none of these three occurrences individually provide a basis for recovery under the Act.

First, the Court will address the plaintiff's contention that her husband's dismissal from his job with the Southern Pacific Railroad provides a basis for redress under the Act. Initially, this Court finds that the plaintiff cannot recover based on this conten-

tion because substantial evidence indicates that the decision to terminate Southern Pacific's Japanese employees, including Mr. Kaneko, was made solely by the Southern Pacific Railroad as a private entity. The ORA so found and this Court finds no arbitrary and capricious action or abuse of discretion in this finding. Mr. Kaneko was dismissed from the Southern Pacific Railroad on February 18, 1942. Examination of the documents created prior to Mr. Kaneko's dismissal indicates that communications from the Federal Government to private employers consistently directed employers not to dismiss their employees of Japanese ancestry. For instance, Agent Norton of the FBI, as recounted in the December 8, 1941 memorandum to the office of the president of Burlington Railroad, in response to questions as to what Burlington Railroad should do in regard to its employees of Japanese descent, neither directed nor insinuated to the railroad that it should dismiss these employees. Rather, Agent Norton stated to the Burlington Railroad officials that "[t]he only instructions that I could give you would be to watch them to see that the Japanese employees do not leave the vicinity of their employment and do not get into any bombings or other sabotage." AR 19. Further, on December 10, 1941, the Headquarters Seventh Corps Area, Office of Assistant Chief of Staff for Military Intelligence, advised the president of Union Pacific Railroad specifically to "not dismiss Japanese, but place [them] under careful observation on work where opportunity for sabotage is small or negligible * * *." AR at 20. Thus, in private discussions with two separate railroads, the Government's position was that the railroads should not dismiss its employees of Japanese descent. Moreover, both Burlington Railroad and Union Pacific Railroad had operations in the same Western States and vicinities as had the Southern Pacific Railroad. Thus, it would not be rational to conclude that, while the Government was directing other railroads in the area to maintain their Japanese employees, it was ordering Southern Pacific to act in precisely the opposite manner and terminate its employees of Japanese ancestry.

Beyond these examples of specific direction to particular employers by the Federal Government, the stated public policy of the Government, at the time Mr. Kaneko was dismissed, was that employers should maintain their employees of Japanese ancestry. On December 28, 1941, Attorney General Biddle publicly urged employers not to dismiss their Japanese employees:

> [I]t is the stated policy of the Federal Government that there shall be no discrimination in the employment of workers in defense industries because of race, creed, color or national origin. * * * There is no reason in the world why loyal persons, either aliens or immigrants of foreign birth, should not be employed by American industry; and there is no possible justification for discharging such employes [sic]. The Federal Government condemns such discrimination and urges all employers not to adopt such a policy.

AR at 21–22.

By contrast, when properly scrutinized, the documents indicating that the Federal Government may have played a role in Mr. Kaneko's dismissal are not probative and do not counter the documentary evidence compelling a contrary conclusion. The first document is a letter dated December 14, 1990, written in response to the ORA's request for information concerning another Japanese employee, Mr. Inouye, who had been dismissed from the Southern Pacific Railroad at the same time as Mr. Kaneko. In the letter, Mr. Kenneth Wood of the Southern Pacific Railroad recounted that indeed Mr. Inouye had been dismissed from Southern Pacific in 1942, and his dismissal was "evidently in accordance with instructions rendered by the federal government." Pl's App. at 2. At first blush, this document could be seen as buttressing the plaintiff's position. However, later, upon being questioned by the ORA, Mr. Wood admitted that in fact he did not know the reason for Southern Pacific's decision to terminate its Japanese employees in 1942 and that he had only speculated that it was the result of direction by the Federal Government. AR at 2. Accordingly, the memorandum from Mr. Wood actually provides *no evidence* that the Federal Government was involved in the dismissal of Mr. Kaneko.

Finally, there is the Sines memo dated April 13, 1946, relating to the dismissal of Mr. Fujita, a Japanese worker dismissed on the same date as Mr. Kaneko. The memo states that Mr. Fujita was "[r]emoved from service by Govt. Order account being a Japanese Alien." Pl's App. at 1. The plaintiff would like the Court to deduce from this statement that Mr. Fujita was dismissed by order of the Government, and, therefore, all of Southern Pacific's Japanese workers, including Mr. Kaneko, were similarly dismissed by order of the Government. However, there are numerous problems with reaching such an inference. First, the memorandum was written in 1946, four years after Mr. Fujita and Mr. Kaneko were dismissed from the Southern Pacific Railroad. Moreover, there is no indication from any of the documents in the Administrative Record, or from the plaintiff, that the author of the memo, Mr. Sines, was employed by Southern Pacific at the time Mr. Kaneko was dismissed, or if he was employed by Southern Pacific at the time, that he held a position in which he would have been privy to the reasons that Southern Pacific's Japanese workers were dismissed. It is entirely possible, then, that Mr. Sines, like Mr. Wood years later, did not have firsthand knowledge as to why Mr. Kaneko was dismissed from the Southern Pacific Railroad and was merely speculating as to the reason for Mr. Fujita's termination. Also, this Court has been provided with no information concerning Mr. Fujita. Accepting the argument that the Government directed Southern Pacific to dismiss Mr. Fujita, it is possible that there was information particular to Mr. Fujita that spurred the Government's order to Southern Pacific. If so, then one could not extrapolate from the Government's involvement in Mr. Fujita's dismissal that the Government was similarly involved in Mr. Kaneko's dismissal. In short, the ORA gave the Sines memo very little probative weight because the circumstances surrounding the document were not clearly explained, and this Court can find little fault with that determination.

■ In the final analysis, there was no direct evidence in the form of statutes, regulations, orders, directives, or documents that showed or even indicated that the Federal Government ordered or caused the Southern Pacific Railroad to fire Mr. Kaneko. The ORA came up with none and neither did the plaintiff. Based on this fact and the other documentary evidence that was available in regard to the other railroads operating in the Western States, as well as the contemporaneous pronouncements of high Government officials, the ORA concluded that the Southern Pacific Railroad had terminated Mr. Kaneko's employment in 1942 for its own reasons. Since the Southern Pacific termination order was not based on any Government law, order, or directive, the ORA concluded that Mr. Kaneko did not lose his job due to any action "by or on behalf of" the Federal Government. 50 U.S.C.App. §§ 1989b–7(2)(B)(i)(III) (1994). Under these factual circumstances, considering the evidence proffered by the plaintiff in contrast to the uncontroverted documentary evidence relied upon by the ORA indicating that the Government's position at the time of Mr. Kaneko's dismissal was that private employers should retain their Japanese employees and what other western railroads had done, the Court finds that the ORA's decision, that Mr. Kaneko was not an eligible individual under the Civil Liberties Act, was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The ORA had the duty to weigh the evidence in this instance and to make its decision. It is not up to this Court to reweigh that evidence. As long as the ORA decision was rational and reasonable, this Court will not disturb that ruling. When this Court engages in record review of an agency decision, it "is not empowered to substitute its judgment for that of the agency and the agency construction need not be the only reasonable one that the reviewing court would have reached." *Motoyoshi v. United States,* 33 Fed.Cl. 45, 50 (1995), *citing Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Rather, " 'the judicial function is exhausted when there is found to be a rational basis for the [administrative] conclusions.' " *Motoyoshi v. United States,*

33 Fed.Cl. 45, 50 (1995), *quoting Nabisco, Inc. v. United States,* 220 Ct.Cl. 332, 340, 599 F.2d 415, 419 (1979), *quoting Port Authority of St. Paul v. United States,* 193 Ct.Cl. 108, 120, 432 F.2d 455, 461 (1970). Indeed, this Court has recognized that the agency's decision that a plaintiff is not entitled to compensation is entitled to substantial deference. *Motoyoshi v. United States,* 33 Fed.Cl. 45, 50 (1995).

■ Even if the Court were to accept the plaintiff's contention that the Government directed Mr. Kaneko's dismissal from the Southern Pacific Railroad, this Court would still concur with the ORA's determination that Mr. Kaneko is ineligible for recovery under the Civil Liberties Act. As explained *supra,* to recover under the Civil Liberties Act it is not adequate to assert a loss of liberty or property as a result of some generic Government action. Rather, the Government must have been acting pursuant to the evacuation, relocation, and internment program as implemented by Executive Order No. 9066, 56 Stat. 173, or any other executive or military order. 50 U.S.C.App. §§ 1989b–7(2)(B)(i)(I)–(III) (1994). Mr. Kaneko's dismissal cannot possibly satisfy this requirement. Mr. Kaneko was dismissed on February 18, 1942. However, Executive Order No. 9066, which provided the fiat for the evacuation, relocation, and internment program, was not issued until February 19, 1942. Perhaps more importantly, Proclamation No. 1, which actually implemented the evacuation, relocation, and internment program was not issued until March 2, 1942. Accordingly, the executive and military orders that relate to the evacuation, relocation, and internment program were not issued until after Mr. Kaneko was dismissed from Southern Pacific Railroad. Also, Utah, the area in which Mr. Kaneko worked and lived, never became subject to the evacuation, relocation, and internment program. Proclamation No. 1 declared much of California, Washington, and Oregon military areas in which all individuals of Japanese ancestry either "voluntarily" relocated or eventually were interned in concentration camps. Utah, however, was subject to Public Proclamation No. 2, which merely limited individuals of Japanese ancestry from certain

zones that were deemed vital to the American military, and Mr. Kaneko did not live in any of these areas. Thus, Mr. Kaneko was never subjected to the evacuation, relocation, and internment program.

Even accepting, then, the plaintiff's contention that the Government directed Mr. Kaneko's dismissal from the Southern Pacific Railroad, this Court finds that Mr. Kaneko is not an "eligible individual" under the Civil Liberties Act because any alleged Government action was not taken pursuant to executive or military orders respecting the evacuation, relocation, and internment program, as required by the Civil Liberties Act.

■ The plaintiff also claims that Public Proclamation No. 2 deprived Mr. Kaneko of liberty and property by precluding Southern Pacific from re-employing him at some later date during World War II. However, there is no evidence in the record that Southern Pacific intended to, but was prohibited from, rehiring Mr. Kaneko during World War II. Moreover, Public Proclamation No. 2 probably could not have produced such a deprivation in the first instance. While Public Proclamation No. 2 did declare some of Southern Pacific's properties military zones in which persons of Japanese ancestry were prohibited from entering, not all of Southern Pacific's properties in Utah were so declared. Rather, only a few of the Railroad's properties, which were located at or near trestles, bridges, and tunnels, were actually proclaimed military zones. AR 39. Thus, even if there was evidence that Southern Pacific planned to re-employ Mr. Kaneko during the war, Proclamation No. 2 would not have precluded Southern Pacific from employing Mr. Kaneko at other railroad properties, perhaps even including states farther to the east of Utah.

■ Finally, the Court must address the plaintiff's claim that the freezing of Mr. Kaneko's bank account by the Government qualifies Mr. Kaneko as an "eligible individual." Admittedly, after the commencement of World War II, Mr. Kaneko's bank account with the Commercial Bank of Ogden was frozen by order of the Federal Government. However, while the plaintiff in this instance can establish involvement by the Federal Government in Mr. Kaneko's injury, the plaintiff cannot establish that it is the type of injury that qualifies Mr. Kaneko as an "eligible individual" under the Civil Liberties Act. As explained *supra*, to recover under the Act, a claimant must establish that he was deprived of liberty or property as a result of the evacuation, relocation, and internment program as implemented by the enumerated executive and military orders. However, Mr. Kaneko's bank account was frozen pursuant to the Trading With The Enemy Act, 50 U.S.C.App. § 5(b)(1) (1994). The TWEA was first passed in 1917, decades prior to World War II. Accordingly, the Government's deprivation of Mr. Kaneko's property was not taken pursuant to the evacuation, relocation, and internment program. As such, although a deprivation of property occurred in this instance, it is not one that would qualify Mr. Kaneko as an "eligible individual" under the Civil Liberties Act.

In conclusion, this Court affirms the decision of the ORA finding that the plaintiff is ineligible for restitution under the Civil Liberties Act as a result of her husband's dismissal from the Southern Pacific Railroad, Southern Pacific's alleged subsequent inability to rehire her husband, and the Federal Government's freezing of Mr. Kaneko's bank account. The ORA's decision in this regard was not arbitrary and capricious, an abuse of discretion, or otherwise in violation of law.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is denied, the defendant's cross-motion for summary judgment is granted, and the Complaint is to be dismissed.

Each party is to bear its own costs.