MICHEL, Circuit Judge.
 

 Emiko Kaneko (“Mrs. Kaneko”) appeals the July 16, 1996 decision of the Court of Federal Claims sustaining on a motion for summary judgment a determination by the Office of Redress Administration (“ORA”) that Sotaro Kaneko (“Mr. Kaneko”), Mrs. Kaneko’s deceased husband, was not eligible for $20,000 in monetary redress pursuant to the Civil Liberties Act of 1988 (“the Act”).
 
 Kaneko v. United States,
 
 36 Fed. Cl. 101 (1996). The appeal was submitted for our decision after oral argument on July 2, 1997. Because the Court of Federal Claims correctly held that ORA’s decision that Mr. Kaneko failed to show that his dismissal was caused by government action, and hence failed to show entitlement to redress, was not arbitrary, capricious, an abuse of discretion or otherwise contrary to law, we affirm.
 

 BACKGROUND
 

 Mr. Kaneko immigrated to the United States early in the 20th century. He was employed by the Southern Pacific Railroad, a non-governmental entity, from 1915 until 1942. The Southern Pacific Railroad provided housing for Mr. and Mrs. Kaneko during much of Mr. Kaneko’s employment.
 

 At the start of World War II, the President of the United States ordered that the
 
 *1050
 
 bank accounts and other properties of all Italian, German, and Japanese nationals residing in this country be seized under the authority of the pre-existing Trading With the Enemy Act (“TWEA”), 50 App. U.S.C. § 5(b)(1) (1994). Pursuant to the TWEA, Mr. Kaneko’s bank account was frozen. Moreover, on February 18,1942, Mr. Kaneko and 38 other Japanese employees were dismissed by the Southern Pacific Railroad, and those living in company housing, including Mr. and Mrs. Kaneko, were forced to vacate the housing. Mr. and Mrs. Kaneko had to find alternative employment and alternative housing.
 

 Shortly after the Civil Liberties Act of 1988 was enacted, the ORA contacted Mr. Kaneko regarding his possible eligibility for monetary redress. Mr. Kaneko then submitted relevant information to the ORA. The ORA reviewed Mr. Kaneko’s application and determined that the losses he suffered were not cognizable under the Act and therefore ultimately denied his claim. As Mr. Kaneko died while his claim was pending before the ORA, Mrs. Kaneko appealed the ORA’s decision,
 
 see
 
 50 App. U.S.C. § 1989b-4(8)(A)(i) (authorizing payment to a surviving spouse), and also sought reconsideration of the ORA’s decision. Mr. Kaneko was again found ineligible in light of the fact that ORA’s extensive research failed to reveal evidence that the federal government played any role in the dismissal of Mr. Kaneko from the railroad.
 

 Mrs. Kaneko filed a complaint with the United States Court of Federal Claims on November 21, 1994, alleging three bases for recovery: (1) Mr. Kaneko’s dismissal from Southern Pacific was ordered by the government; (2) Southern Pacific was prohibited from rehiring Mr. Kaneko due to the directives excluding Japanese workers from certain railroad facilities that were designated military zones; and (8) Mr. Kaneko suffered a deprivation of property when his bank account was frozen. The parties filed cross-motions for summary judgment.
 

 The Court of Federal Claims granted the government’s motion for summary judgment on July 16, 1996. As for Mr. Kaneko’s dismissal, the Court of Federal Claims determined that Mr. Kaneko was not eligible for redress because the ORA had found that substantial evidence indicated that the decision to terminate him and the other Japanese employees was made solely by Southern Pacific Railroad as a private entity and the ORA’s decision was not arbitrary, capricious, an abuse of discretion or otherwise contrary to law. As for Mr. Kaneko’s contention that Southern Pacific was precluded from rehiring him, the Court of Federal Claims rejected this argument because there was no evidence that Southern Pacific intended to, but was prohibited from, rehiring him. Finally, as for the frozen bank account, the Court of Federal Claims ruled that deprivation did not make Mr. Kaneko an eligible individual under the Act because the bank account was frozen pursuant to the TWEA, rather than the evacuation, relocation and internment program covered by the Act.
 

 DISCUSSION
 

 The Civil Liberties Act authorizes a onetime payment of $20,000 to each “eligible individual,” defined as follows:
 

 (2) the term “eligible individual” means any individual of Japanese ancestry ... who is living on the date of the enactment of this Act [Aug. 10,1988] and who, during the evacuation, relocation, and internment period—
 

 (A) was a United States citizen or a permanent resident alien; and
 

 (B) (i) was confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of—
 

 (I) Executive Order Numbered 9066, dated February 19,1942;
 

 (II) the Act entitled “An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones”, approved March 21, 1942 (56 Stat. 173); or
 

 (III) any other Executive order, Presidential proclamation, law of the United States, directive of the Armed Forces of the United States, or other action taken by or on behalf of the United States or its agents, represen
 
 *1051
 
 tatives, officers, or employees, respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry; or
 

 (ii) was enrolled on the records of the United States Government during the period beginning on December 7, 1941, and ending on June 30,1946, as being in a prohibited military zone.
 

 50 App. U.S.C. § 1989b-7(h)(l) (1994) (brackets in original).
 

 The Court of Federal Claims and the OKA both determined that Mr. Kaneko was not an “eligible individual.” We review this determination to decide if ORA’s findings and conclusions were “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.”
 
 See
 
 5 U.S.C. § 706(2)(A) (setting forth standard of review for informal proceedings of agencies by reviewing courts); 50 App. U.S.C. § 1989b-4(h) (setting forth the identical standard of review by the Court of Federal Claims). In so doing, we review questions of statutory and regulatory construction de novo, although ORA’s interpretation of the statute it is entrusted with administering is entitled to some deference at least if reasonable and not clearly contrary to legislative intent.
 
 Ishida v. United States,
 
 59 F.3d 1224, 1229 (Fed.Cir. 1995). Here, however, the appeal turns not so much on interpretation of statutory terms as their application to the facts as found in the face of conflicting evidence.
 

 I.
 

 Mrs. Kaneko’s first argument is that the ORA and the Court of Federal Claims applied the wrong standard in analyzing Mr. Kaneko’s claim. The ORA found that considerable evidence indicated that the decision to dismiss Mr. Kaneko was made solely by the Southern Pacific Railroad and the Court of Federal Claims determined that the ORA’s decision was not arbitrary, capricious, an abuse of discretion or otherwise contrary to law. Mrs. Kaneko, however, argues that such a standard should not have been used because of the following language in the Civil Liberties Act:
 

 When, after consideration of all evidence and relevant material for determining whether an individual is an eligible individual, there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility, the benefit of the doubt in resolving each such issue shall be given to such individual.
 

 50 App. U.S.C. § 1989b-4(a)(3) (1994).
 

 Thus, Mrs. Kaneko argues the trial court was expressly required to determine (1) whether “an approximate balance of positive and negative evidence” material to eligibility was before the agency and (2) if so, whether the agency gave the claimant the benefit of the doubt. Mrs. Kaneko argues the ORA and the trial court did not incorporate this standard into their analyses and therefore did not resolve factual issues in favor of eligibility when there was a reasonable interpretation of the evidence that supported eligibility. She argues, in effect, that this omission is error per se, but cites no support for that proposition.
 

 While we agree with Mrs. Kaneko that the “benefit of the doubt” standard must be applied in appropriate cases, we cannot agree that this is such a case. As discussed below, this is not a case where “there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility.” On the contrary, here the evidence overwhelmingly, although not entirely, supports the ORA’s decision.
 

 There are two pieces of evidence that could support Mrs. Kaneko’s argument that Mr. Kaneko was dismissed at the direction of the government. On February 18, 1942, the Southern Pacific Railroad terminated all 39 of its Japanese employees including Mr. Kaneko. These employees were terminated one day before the date on Executive Order 9066 which directed the Secretary of War and his designated military commanders to prescribe military areas to which they could designate who could “enter, remain in, or leave subject to” their discretion. 7 Fed.Reg. 1407 (1942).
 

 Two documents created after the decision to terminate the 39 Japanese employees indicate that the decision to dismiss them was the result of a directive from the govern
 
 *1052
 
 ment. First, a Southern Pacific Railroad document authored by an official named Mr. Sines and dated April 13, 1946 states that another worker, Mr. Fujita, who was removed at the same time as Mr. Kaneko, was “[rjemoved from service by Govt. Order [on] account [of] being a Japanese Alien.” Mrs. Kaneko argues the trial court erred in not accepting the Sines memo as accurate, given that it was allegedly prepared in the ordinary course of business and there was no reason for Mr. Sines to lie. Mrs. Kaneko further argues she need not present evidence regarding Mr. Fujita because it is unreasonable to conclude that one Japanese worker was removed on government orders, but that others dismissed at the same time were not. However, it was permissible for the ORA to discredit this document, as it makes no mention of Mr. Kaneko and there is no evidence that Mr. Sines had personal knowledge of the reason for Mr. Kaneko’s termination or, for that matter, Mr. Fujita’s. Even accepting the Sines memo as accurate, the decision of the ORA was not arbitrary or capricious or otherwise not in accordance with law, given the strength of the evidence, discussed below, suggesting no such government policy existed and no such actions were taken by the government against Southern Pacific Railroad or Mr. Kaneko.
 

 The second piece of evidence that arguably supports Mrs. Kaneko’s position is a 1990 response by Southern Pacific to an inquiry by ORA concerning the dismissal of a Mr. Inouye, another employee dismissed from Southern Pacific Railroad at the same time as Mr. Kaneko. Authored by Kenneth Wood and dated December 14, 1990, the response states that Mr. Inouye’s dismissal was “evidently in accordance with instructions rendered by the federal government.” Mrs. Kaneko argues the trial court failed to give proper weight to Mr. Wood’s letter, especially as it is verified as truthful by Barbara A. Sprung, an attorney, as evidenced by a notation at the bottom of the letter and above her signature stating “I certify that the foregoing is true and correct.” However, it was certainly not an abuse of discretion for the ORA to discredit this memo in light of a subsequent memo by Tink Cooper, counsel for the ORA, in the administrative record indicating that Wood had been contacted by the government and had indicated he had no personal knowledge of the circumstances regarding Mr. Inouye’s dismissal and was only speculating as to the reason for dismissal.
 

 On the other hand, there is much evidence suggesting that any actions taken against Mr. Kaneko were not at the direction of the federal government. Indeed, the stated policy of the government at the time was that Japanese employees should
 
 not
 
 be dismissed, as evidenced by Attorney General Biddle’s public statement, issued in 1941 as a press release by the Department of Justice, that employers should not dismiss their Japanese employees. Specifically, General Biddle declared “it is the stated policy of the Federal Government that there shall be no discrimination in the employment of workers in defense industries because of race, creed, color or national origin.” General Biddle’s statement further provided that “[n]o more shortsighted, wasteful or un-American policy could possibly be adopted at this time than that of barring non-citizens from legitimate private employment.”
 

 Moreover, the railroads were expressly advised not to fire their Japanese employees. For example, a memorandum written by Agent Norton of the Federal Bureau of Investigation to Burlington Railroad in 1941 indicates that “[t]he only instructions I could give you would be to watch them and see that the Japanese employees do not leave the vicinity of their employment and do not get into any bombings or other sabotage.” Similarly, a 1941 memorandum from the Office of Assistant Chief of Staff for Military Intelligence advises the Union Pacific Railroad: “Do not dismiss Japanese, but place under careful observation on work where opportunity for sabotage is small or negligible, if possible.”
 

 Finally, there is contemporaneous evidence that the Union Pacific Railroad fired its Japanese employees, not because the federal government so directed, but because there had been a safety incident and there was concern that the labor union would stop work unless all Japanese were dismissed.
 

 
 *1053
 
 II.
 

 Mrs. Kaneko also argues that Public Proclamation No. 2, issued shortly after Mr. Kaneko was fired by the Southern Pacific Railroad, declaring certain railroad facilities, such as trestles, bridges and tunnels, off-limits to workers of Japanese descent, prevented Southern Pacific from rehiring Mr. Kaneko. Mrs. Kaneko did not present any evidence to support this theory and it was permissible for the ORA to reject this theory, given the total absence of evidence showing that the Southern Pacific Railroad wanted to, but was prohibited by the federal government from, rehiring Mr. Kaneko.
 

 Finally, Mrs. Kaneko argues that, as Mr. Kaneko’s bank account was frozen, he was entitled to redress. However, the account was frozen pursuant to the TWEA, first enacted in 1917 long before the start of World War II, and therefore was not related to any evacuation, internment or relocation program, as required for redress under the Civil Liberties Act.
 

 III.
 

 Finally, Mrs. Kaneko argues that the trial court erred by holding that the government must have been acting pursuant to the evacuation, relocation, and internment program as implemented by Executive Order 9066 in order to trigger the redress provision and therefore only those individuals evacuated after the issuance of Executive Order 9066 could be eligible. The statute is plain on its face: to be eligible for monetary redress, an individual must have been deprived of liberty or property as a result of Executive Order 9066
 
 or “any other
 
 Executive order, Presidential proclamation, law of the United States, directive of the Armed Forces of the United States,
 
 or other action
 
 taken by or on behalf of the United States ... respecting the evacuation, relocation, or internment” of those of Japanese descent. 50 App. U.S.C. § 1989b — 7(h)(1) (1994) (emphasis added). We therefore agree that Mrs. Kaneko’s recovery cannot be foreclosed simply because Mr. Kaneko was dismissed on February 18, 1942, prior to the issuance of Executive Order 9066 on February 19, 1942. There is, however, language in the opinion of the Court of Federal Claims that seems to suggest that it thought the timing of Mr. Kaneko’s termination affected his (and his wife’s) right to recovery. Namely, the Court of Federal Claims stated that “the executive and military orders that relate to the evacuation, relocation, and internment program were not issued until after Mr. Kaneko was dismissed from Southern Pacific Railroad” and that therefore Mr. Kaneko could not be an eligible individual. However, any such error by the Court of Federal Claims was harmless. The trial court’s primary reason for granting summary judgment in favor of the government was that the ORA did not act in an arbitrary or capricious manner in determining that the evidence did not demonstrate that Mr. Kaneko was dismissed due to government action. 36 Fed. Cl. at 109 (“In the final analysis, there was no direct evidence in the form of statutes, regulations, orders, directives, or documents that showed or even indicated that the Federal Government ordered or caused the Southern Pacific Railroad to fire Mr. Kaneko.”). As discussed above, this assertion is undeniably correct.
 

 CONCLUSION
 

 We have little doubt that Mr. Kaneko and his wife suffered greatly due to his dismissal from both the job and company housing. However, we are constrained by the express terms of the Civil Liberties Act which authorize redress only for deprivations of liberty or property due to actions taken by or on behalf of the United States, not those taken unilaterally by a private employer such as the Southern Pacific Railroad.
 

 We are not fact finders, and we cannot reverse the fact finding of ORA unless it is shown to be “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). Although there is evidence that favors Mr. Kaneko, there is also evidence that cuts against Mr. Kaneko, and we cannot say that the evidence that favors Mr. Kaneko is enough to meet the “arbitrary and capricious” standard set forth for us by Congress. The only way that the ORA decision could be arbitrary and capricious would be if ORA
 
 *1054
 
 was required to draw the inference that the Southern Pacific memoranda discussed above proved that Mr. Kaneko and Mr. Fujita were fired because of government demands. However, there was considerable evidence that the government made no such demands on any railroad. We cannot say, therefore, that ORA was required to draw the inference. “Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous,”
 
 Anderson v. City of Bessemer City, North Carolina,
 
 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1984), ah the less could it be arbitrary and capricious. The test is whether the views of truth between which the fact finder selected were both plausible. We hold that the inference that labor union demands or plain xenophobia is as plausible as government demands.
 

 We hold therefore, as a matter of law, that the record evidence supports the trial court’s conclusion that the harms suffered by Mr. Kaneko were not caused by government action. No record evidence demonstrates a federal government policy of requiring the dismissal of Japanese employees from railroads or prohibiting their rehiring. Nor is there any other indication that Mr. Kaneko “was confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of ... any other Executive order, Presidential proclamation, law of the United States, directive of the Armed Forces of the United States, or other action taken by or on behalf of the United States or its agents, representatives, officers, or employees, respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry.” 50 App. U.S.C. § 1989b-7(2)(B). One of the two pieces of evidence even suggesting otherwise was properly discounted, since Mr. Woods later recanted his statement, and the Sines memo does not dictate a different outcome even under the “benefit of the doubt” standard because given the rest of the record evidence there is not an approximate balance of positive and negative information. In sum, there was adequate evidence that Mr. Kaneko’s dismissal was based on private action, not federal government action, and the decision that Mr. Kaneko had not demonstrated eligibility for redress was not arbitrary, capricious, an abuse of discretion or otherwise contrary to law. Accordingly, the grant of summary judgment upholding the ORA decision is
 

 AFFIRMED.