**Robert K. MURAKAMI, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–55C.**

United States Court of Federal Claims.

April 4, 2002.

John Howard Ota, Alameda, California, for the plaintiff.

Steven J. Abelson, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for the defendant.

## OPINION

ALLEGRA, Judge.

This case is before the court on cross-motions on the administrative record. Plaintiff seeks review of the Attorney General's denial of his claim for redress under the Civil Liberties Act of 1988 (the Act), 50 U.S.C. app. § 1989b, *et seq.* (1988 & Supp. V 1993). Congress passed the Act in recognition of "the fundamental injustice of the evacuation, relocation, and internment of United States citizens and permanent resident aliens of Japanese ancestry during [World War II]." 50 U.S.C. app. § 1989(1). The Act establishes a comprehensive program for paying restitution to individuals of Japanese ancestry who were interned, relocated or otherwise deprived of their liberties. *See* 50 U.S.C. app. § 1989b–4(a) & (b). For the reasons discussed below, defendant's motion on the administrative record is **DENIED** and plaintiff's cross-motion on the administrative record is **GRANTED**, in part.

## I. Background

### A. Historical Background

On February 19, 1942, ten weeks after the attack on Pearl Harbor, President Franklin D. Roosevelt issued Executive Order 9066, which authorized military commanders to establish "military areas" in the United States and exclude therefrom any and all persons whenever deemed militarily necessary. Under the authority of this Order, the military commander of the Western Defense Command issued a series of Public Proclamations which designated vast areas of the western United States "military areas" and prohibited all individuals of Japanese descent, U.S. citizens and otherwise, from living, working or

traveling in these areas. Congress sanctioned the prohibitions by imposing criminal penalties for violations of the restrictions established. Individuals of Japanese descent living in the military areas at the time the restrictions came into effect were initially ordered to evacuate the areas and, later, were forcibly removed by the Army to militarily guarded "relocation" centers.

On December 17, 1944, the Commanding General of the Western Defense Command Headquarters issued Public Proclamation No. 21, 10 Fed.Reg. 53 (1945), which became fully effective on January 2, 1945, and modified "the system of mass exclusion of persons of Japanese ancestry" to "a system of individual determination and exclusions of those individuals whose presence within sensitive areas of the Western Defense Command deemed a source of potential danger to the military security thereof." *Id.* The recision of the mass exclusion order was based on an individualized vetting process which resulted in the development of lists of individuals who would remain subject to the exclusion orders and the development of a "white list" of individuals who would no longer be excluded after the effective dates. Individual exclusion orders remaining after January 2 were rescinded on a case-by-case basis, but by September 4, 1945, all remaining individual exclusion orders were lifted, and there was no exclusion for any person after that date. *See* Public Proclamation No. 24, 10 Fed.Reg. 11760 (1945).

In 1980, Congress established the Commission on Wartime Relocation and Internment of Civilians (the Commission) to investigate and document the impact of Executive Order 9066 on Japanese American citizens and permanent resident aliens. *See* Pub.L. No. 96–317, 94 Stat. 964, § 2 (1980). In 1982 and 1983, the Commission issued a report and recommendations. *See* Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians (The Civil Liberties Public Education Fund and the University of Washington Press 1997). The Act essentially adopts the recommenda-

tions of the Commission, which include a formal statement of apology to individuals excluded from their homes under Executive Order 9066 because of their Japanese ancestry and a one-time payment of $20,000 to each "eligible" individual.

## B. Factual Background and Case Procedural History

Plaintiff's parents, Arthur and Aiko Murakami, were forced to move from their homes in the Los Angeles area to the Manzanar Relocation Center in 1942, pursuant to the Public Proclamations issued under the authority of Executive Order No. 9066.[1] In the summer of 1944, plaintiff's mother and father left Manzanar and moved to Chicago, Illinois. Later in that year, plaintiff's mother, Aiko, became pregnant with plaintiff. As confirmed by a letter dated February 10, 1945, plaintiff's father, Arthur, was the subject of one of the individual exclusion orders that remained after the lifting of the mass exclusion orders on January 2, 1945, and as such was prohibited from being in, remaining in, or entering the "West Coast Exclusion Zone," which included "California and other West Coast locations." On July 21, 1945, Arthur Murakami's individual exclusion order was rescinded and he was "authorized to travel and reside within the West Coast Exclusion Zone of the Western Defense Command." Thirty three days later, on August 23, 1945, plaintiff was born in Chicago, Illinois.

On October 29, 1996, plaintiff filed a claim with the Office of Redress Administration (ORA) for a redress payment under the Act. On June 23, 1997, the ORA determined that plaintiff was not eligible to receive compensation under the Act. The decision from the ORA indicated that plaintiff's case "was reviewed pursuant to the new standards in *Ishida* [*v. United States*, 59 F.3d 1224 (Fed. Cir.1995)]. . ." and that the ORA had determined that plaintiff was "ineligible for redress pursuant to the Act and its regulations." The ORA found that plaintiff did not indicate that he was evacuated, relocated, or

---

1. Arthur and Aiko Murakami were among those "enrolled on the records of the United States Government . . . as being in a prohibited military

zone," *see* 50 U.S.C.App. § 1989b–7(2)(B)(ii), and they both received compensation under the Act.

interned pursuant to any federal government orders due to his Japanese ancestry. The ORA also found that plaintiff was not deprived of liberty under the standard established in *Ishida*, because he was not "excluded by law" from his parents' original place of residence, having been born after the rescission of the mass exclusion orders on January 2, 1945. The ORA accordingly held that, "pursuant to the restrictive language of the Act and the regulations implementing the Act, we must conclude that you are not eligible to receive compensation."

On July 28, 1997, plaintiff appealed the ORA's decision to the Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice, asserting that he was deprived of liberty because his father's individual exclusion order was not rescinded until July 21, 1945, "far too late for [his] parents to return to the West Coast as [he] was born on August 23, 1945." By letter dated March 25, 1998, the Chief of the Appellate Section of the Civil Rights Division, pursuant to the authority delegated him by the Assistant Attorney General, notified plaintiff that he had declined to set aside ORA's decision. The letter further explained that the "ORA reviewed [Mr. Murakami's] claim under the new standard set forth by the U.S. Court of Appeals in [*Ishida*]," and it went on to review again Mr. Murakami's claim under that same standard. The letter noted that the deprivation of liberty for internee's children acknowledged in *Ishida* was based on a legal restriction on return to the exclusion zones, and concluded that "[b]ecause you were never subject to legal exclusion from you home on the West Coast, you are not eligible for redress under the *Ishida* standard. Accordingly, I cannot set aside ORA's decision." On February 5, 1999, plaintiff filed a complaint in this court, pursuant to 50 App. U.S.C. § 1989b–4(h)(1), seeking judicial review of the denial of compensation. This court subsequently determined that it had jurisdiction over this complaint and that the claims therein had not been rendered moot by the sunset of the Act. *See Murakami v. United States*, 46 Fed.Cl. 653 (2000).

After the complaint was filed, plaintiff submitted a motion seeking to supplement the administrative record and seeking judicial notice of documents related to the actions of U.S. government around the time of his father's internment. By order dated May 31, 2000, this court denied plaintiff's motion on the ground that plaintiff's request did not fall within any of the limited exceptions allowing for supplementation of an administrative record. *See Murakami v. United States*, 46 Fed.Cl. 731 (2000).

On May 22, 2001, plaintiff filed a motion for summary judgment on the administrative record, including therewith a declaration from plaintiff's father which the court had previously declined to include in a supplement to the administrative record. On May 30, 2001, defendant filed a motion seeking to strike the declaration of plaintiff's father, and any references to that document, as well as any other portions of plaintiff's motion that would support arguments not raised before the agency below. By order dated June 18, 2001, this court granted defendant's motion by striking from plaintiff's motion the declaration of plaintiff's father and all references to that declaration. The court did not strike part V. of plaintiff's argument, which was related to this declaration, but noted that defendant could argue that the contentions raised in this part of the memorandum were not properly before the court. On July 23, 2001, defendant filed a cross-motion for summary judgment on the administrative record. Oral argument on the motion and cross-motion was conducted on December 5, 2001.

## II. Discussion

### A. Standard on Review

By the terms of the Act, judicial review of a denial of compensation under the Act is available only in this court. 50 App. U.S.C. § 1989b–4(h)(1) (2001). The Act also provides the applicable standard of review, noting that this court "shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.*

### B. Analysis

In the instant case, plaintiff makes various arguments seeking to set aside the denial of his claim. Among them is that ORA improperly denied his claim by failing to conclude that he had been "otherwise deprived of liberty" as a result of the orders which he claims proximately caused him to be born in Chicago rather than his parent's home town of Los Angeles. To place this and his other claims in context, the court begins with the relevant language of the statute, which provides that a United States citizen or permanent resident alien of Japanese ancestry living on the date of the Act's passage is eligible for redress if, during the evacuation, relocation, and internment period, he or she "was confined, held in custody, relocated, *or otherwise deprived of liberty* or property as a result of" government laws, orders, or other actions. 50 U.S.C. § 1989b–7(2) (emphasis added).

Neither the Act nor its implementing regulations precisely define what constitutes a compensable deprivation of liberty, other than actual evacuation, relocation, or internment. *Odow v. United States,* 51 Fed.Cl. 425, 428 (2001), *appeal pending,* No. 02–5067 (Fed.Cir.). Rather, the regulations promulgated by the ORA approach this issue by establishing categories of individuals who are deemed to have been "deprived of liberty." 28 C.F.R. § 74.3(b) (2000). The regulation also has a catch all provision which provides that the previously-identified categories do "not [constitute] an exhaustive list of individuals who are deemed eligible for compensation; there may be other individuals determined to be eligible under the Act on a case-by-case basis by the Redress Administrator." *Id.* § 74.3(c). Following the Federal Circuit's decision in *Ishida v. United States,* 59 F.3d 1224 (Fed.Cir.1995), the regulation was amended and the list of categories expanded to provide relief explicitly to:

[i]ndividuals born on or before January 20, 1945, to a parent or parents who had been evacuated, relocated, or interned from his or her original place of residence in the prohibited military zones on the West Coast, on or after March 2, 1942, pursuant to paragraph (a)(4) of this section, and who were excluded by Executive Order 9066 or military proclamations issued under its authority, from their parent's or parents' original place of residence in the prohibited military zones of the West Coast.

28 C.F.R. § 74.3(b)(9) (1997); *see also Ishida,* 59 F.3d at 1229–30. The catch-all provision in the regulation was unaffected by this amendment.

■ Plaintiff proffers three reasons why the ORA's decision denying him relief under the Act was arbitrary, capricious or otherwise contrary to law. First, he argues that he derivatively suffered a deprivation of liberty under the Act because his father was denied due process when the decision was made individually to exclude him after January 2, 1945. Next, he asserts that he suffered a deprivation of liberty because the government did not lift the individual exclusion order against his father until one month before his birth, thereby effectively preventing him from being born at his parent's home. Lastly, he charges that he suffered a deprivation of liberty as a result of the nature of the rescission order given to his father, which suggested that plaintiff's father carry an identification card before returning to the West Coast Exclusion Zone, effectively, in plaintiff's view, continuing to impose on his father, and thus on plaintiff, a deprivation of liberty. Two of these claims are disposed of readily. In short order, the court thus agrees with defendant that plaintiff was not deprived of liberty as a result of an alleged due process violation that was suffered by his father[2] and that plaintiff did not raise the

---

**2.** Plaintiff argues that his father was arbitrarily deprived of the fundamental constitutional right to interstate travel, as well as the constitutional right of due process, because he was the subject of an individual exclusion order beyond the January 20, 1945, general rescission date without the benefit of a reason or a hearing to contest the order. According to plaintiff, because plaintiff's father's was deprived of his fundamental consti-

tutional rights, plaintiff, who as a newborn child was completely dependent on his parents, was by extension deprived of liberty and fundamental constitutional rights. The court, however, concludes that, except as specifically provided, *see* 50 App. U.S.C. § 1989b–7(2)(B), the Act does not directly compensate for a harm suffered by another. However, this conclusion does not fore-

argument regarding the identification card before the ORA, thereby effectively waiving that argument before this court. However, plaintiff's surviving contention of error—that the ORA improperly considered plaintiff's contention that he suffered a deprivation of liberty because he was effectively prevented from being born at his parent's home—stands on a much more solid, and potentially fertile, ground. It is to that claim the court now turns.

Plaintiff contends that he suffered a deprivation of liberty because his father's individual exclusion order was rescinded only thirty-three days prior to his birth, too late to allow plaintiff's parents to return safely to California. He asserts that his mother, a few days shy of eight months pregnant and thus, at best, a few weeks from delivery, could not travel by train, during the high summer, from Chicago to the Los Angeles area for his birth. The ORA, of course, rejected this claim, not because it discounted plaintiff's assertions regarding his mother's advanced stage of pregnancy, but simply because plaintiff had been born after July 21, 1945, the date his father's individual exclusion order was rescinded. As explained by defendant's counsel on brief and again at oral argument, the ORA analytically approached this case by taking the *Ishida* exception in the regulations and changing the January 20, 1945, trigger date therein to read "July 21, 1945." Illustrating this further, defendant indicates that plaintiff's claim was rejected because, to paraphrase the regulation, he was not an "[i]ndividual[ ] born on or before [July 21, 1945] . . ., to a parent or parents who had been evacuated, relocated, or interned from his or her original place of residence . . ." In other words, the agency held that plaintiff had not been deprived of liberty because his

father was not legally restrained from returning to California as of the date of his birth. Pressing this analysis to a dryly logical extreme, counsel for defendant, at oral argument, indicated that compensation would not be owed here even if Mrs. Murakami had been suffering the pangs of labor on July 21, 1945, and given birth to her son mere hours after the exclusion order against her husband had been lifted.

While defendant's counsel believes that this result is statutorily preordained, the court has its own pangs—pangs of doubts about this position—and believes that the approach taken by the ORA, at the least, inadequately considered whether, aside from applying the modified version of the *Ishida* provision in the regulation, plaintiff was "otherwise deprived of liberty" within the meaning of section 74.3(c) of the regulations and the language of the Act. Ultimately, these lingering doubts compel this court to remand this matter to the Department of Justice for further consideration. Further explanation of this conclusion is warranted.

■ It appears that the ORA proceeded in this case as if the *Ishida* provision in its regulation, modified to deal with the date individual exclusion orders was rescinded, is the only basis upon which a child born after January 20, 1945, at other than his parent's original home could qualify for redress. Because Mr. Murakami failed to meet this modified requirement—he was born after the rescission of his father's exclusion order took effect—he was, *a priori*, found not to have suffered a qualifying deprivation of liberty. Although the ORA's interpretation of its own regulations is undoubtedly entitled to respect,[3] the court believes that interpretation was wrong for several reasons.

close plaintiff from recovering due to hardships directly imposed on his own liberties.

**3.** Defendant heartily invokes the deference accorded agency interpretations under *Chevron U.S.A., Inc. v. Natural Resources Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Recently, the Supreme Court has cabined that doctrine somewhat. In *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), for example, it held that "[i]nterpretations such as those in opinion letters—like interpretations contained in poli-

cy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." It stated that such agency interpretations are entitled to respect, but only "to the extent that those interpretations have the 'power to persuade.'" *Id.* (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). Then, in *United States v. Mead Corp.,* 533 U.S. 218, 230–34, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), the Court emphasized that interpretations that do not have the force of law—particularly, those not subjected to notice and comment—are "beyond

First, contrary to the ORA's apparent view, there is not the slightest hint in *Ishida* that the Federal Circuit intended to define exclusively the only category of individuals born away from their parent's traditional homes who were "otherwise deprived of liberty." Certainly, nothing in that opinion's language begins to suggest this. To the contrary, while the court rejected the ORA's wooden interpretation of its prior regulations and carefully concluded that individuals were deprived of basic civil liberties because they were excluded from their "original place of residence" during the statutory period as a result of specified government action, it did not conclude, nor even purport to address, whether other individuals might demonstrate, in different circumstances, that they too had been "otherwise deprived of liberty or property" within the meaning of the Act.[4] Properly viewed in terms of its holding, then, *Ishida* is an inclusive rather than exclusive decision, for while it identifies a group of individuals that qualify for redress, it in no way suggests that group is the only one which qualifies as "otherwise deprived of liberty." *See Odow*, 51 Fed.Cl. at 433–34. Indeed, the rationale in *Ishida* is more encompassing, rather than limiting. Thus, in concluding that Mr. Ishida was entitled to redress, the Federal Circuit reasoned that "Congress clearly intended that all individuals deprived of liberty by being excluded from their homes as a result of the enumerated government actions be eligible." *Ishida*, 59 F.3d at 1232. Moreover, the court made short shrift of the government's assertion that only individuals "directly affected" by internment or relocation orders were eligible, stating that "neither the Act, the regulations, nor the legislative history includes 'directly affected' in the test for eligibility." *Id.; see also Odow*, 51 Fed.Cl. at 434 (interpreting *Ishida* and holding "[t]he statute does not establish a hierarchy of deprivation.").

In considering plaintiff's claim here, the ORA thus appears to have employed a faulty, overly narrow reading of *Ishida*, which, in turn, led it legally astray in analyzing Mr. Murakami's claim. Apart from a fair reading of *Ishida*, to realize this, one need only consult the ORA regulations, which state that the categories of eligible individuals listed in the regulation, among which is the *Ishida*-type claimant, is "not an exhaustive list of individuals who are deemed eligible for compensation," indicating further that "there may be other individuals determined to be eligible under the Act on a case-by-case basis by the Redress Administrator." 28 C.F.R. § 74.3(c). Here, there is no indication that a complete case-by-case analysis, fully effectuating the terms of, and Congressional intent underlying, the Act was ever undertaken.

Of course, there is more potentially afoot here—there are indications that the ORA's handling of the claim in question derived not from a failure to apply its regulations, but instead reflected the agency's decided view that a deprivation of liberty must result from a then-existing legal restraint, rather than from the practical hindrances flowing from a prior legal restraint. Under this theory, since Mr. Murakami parents were not "excluded by law" at the time of his birth, he does not qualify for redress. While it remains to be determined on remand if that, indeed, is the ORA's legal position, the court seriously doubts whether that view comports with the Congressional intent evidenced in the plain language of the statute. *See Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (recognizing that undefined words in a statute ordinary should "be interpreted as taking their ordinary, contemporary, common meaning"). Specifically, such an inflexible approach seemingly conflicts with that portion of the statute which provides that an individual is eligible redress

the *Chevron* pale." *Id.* at 234, 121 S.Ct. 2164; *see also Vons Companies, Inc. v. United States*, 51 Fed.Cl. 1, 7 (2001). At all events, *Chevron* also states that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." 467 U.S. at 843 n. 9, 104 S.Ct. 2778.

4. In *Ishida*, a child born during the general rescission orders to parents who had "voluntarily" evacuated applied for compensation under the Act. The ORA determined, and the DOJ affirmed, that the child was not eligible because his "losses were not the result of government action as defined in the Act and the implementing regulations." *Ishida*, 59 F.3d at 1228.

if otherwise deprived of liberty or property "as a result of" the listed government laws or orders. The ordinary meaning of the noun "result" is "something that results as a consequence, issue, or conclusion." Merriam–Webster's Collegiate Dictionary 999 (10th ed.1998). Consistent with this usage, the phrase "as a result of" has, in various and sundry contexts, been construed to mean "caused by." [5]

Perhaps the most analogous and useful illustration of this is *Brown v. Gardner,* 513 U.S. 115, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994), in which the Supreme Court construed the phrase "as a result of" in a statute conferring medical benefits on certain veterans. In that case, a veteran was denied benefits for nerve and muscle damage to his leg allegedly resulting from surgery performed at a Department of Veterans Affairs (VA) hospital for a nonservice-connected back condition. He claimed benefits under 38 U.S.C. § 1151 (1988 ed., Supp. V), which provides that the VA will compensate for an "an injury or an aggravation of an injury," that occurs "as the result of hospitalization, medical or surgical treatment, or the pursuit of a course of vocational rehabilitation." The VA and the Board of Veterans Appeals denied Gardner's claim for benefits, on the ground that section 1151, as interpreted by the VA in 38 C.F.R. § 3.358(c)(3)(1993), only covers an injury if it "proximately resulted [from] carelessness, negligence, lack of proper skill, error in judgment, or similar instances of indicated fault" on the part of the VA, or from occurrence during treatment or rehabilitation of an "accident," defined as an "unforeseen, untoward" event. The Court of Veterans Appeals reversed, holding that the VA had too narrowly construed the "as the result of" language in the statute in adopting

the fault-or-accident requirement in the regulations. *Gardner v. Derwinski,* 1 Vet.App. 584 (1991). Agreeing with this analysis, the Federal Circuit affirmed, *Gardner v. Brown,* 5 F.3d 1456 (Fed.Cir.1993), stating for its own part:

> We are convinced that 'as a result of' as used in 38 U.S.C. § 1151 mandates only a causation requirement. *See Webster's Third New Int'l Dictionary* 1937 (1971) (defining 'result' as 'a consequence, effect, issue, or conclusion'). Under section 1151 the specified treatment must *cause* the injury or the aggravation of injury.

5 F.3d at 1459 (emphasis supplied). The Federal Circuit further rejected the VA's arguments that its long-standing regulations were entitled to deference, concluding that "Congress has spoken clearly on the issue of fault or accident, and unambiguously has not required it." 5 F.3d at 1463.

The Supreme granted certiorari and, in turn, affirmed the Federal Circuit. In discussing the "as a result of" language in section 1151, the court rejected the cramped interpretation in the VA's regulations, reasoning—

> In a second attempt to impose a VA-fault requirement, the Government suggests that the 'as a result of' language of § 1151 signifies a proximate cause requirement that incorporates a fault test. Once again, we find the suggestion implausible. This language is naturally read simply to impose the requirement of a causal connection between the 'injury' or the 'aggravation of an injury' and 'hospitalization, medical or surgical treatment or the pursuit of a course of vocational rehabilitation.' Assuming that the connection is limited to proximate causation so as to

---

**5.** *See Black Hills Aviation Inc. v. United States,* 34 F.3d 968, 975 (10th Cir.1994) (in construing Army regulations, "[t]he use of the plain language—'as a result of'—is logically interpreted to mean 'caused by.' "); *In re Woodward & Lothrop Holdings, Inc.,* 205 B.R. 365, 372–73 (Bankr. S.D.N.Y.1997) (in pleadings, "[t]he use of the phrase 'as a result of' connotes a causal connection"); *see also American Ins. Co. of City of Newark v. Keane,* 233 F.2d 354, 360 (D.C.Cir. 1956) (applying the dictionary definition of term "result" and holding, in insurance case, that "if the claim proceeds from or arises as a conse-

quence of or is occasioned by the operation of the vessel's engine, it is one 'resulting from' such operation"), *cert. denied,* 352 U.S. 913, 77 S.Ct. 147, 1 L.Ed.2d 118 (1956). *Accord: Finstad v. Washburn University of Topeka,* 252 Kan. 465, 845 P.2d 685, 689–90 (1993) (in state consumer protection act, "as a result of" suggests "causal link"); *John Hancock Mutual Life Ins. Co. v. Serio,* 176 A.2d 874, 875 (D.C.1962) ("The words 'as a result of' are identical in meaning to 'resulting from,' which latter phrase [can be] considered equivalent to the test of proximate cause.")

narrow the class of compensable cases, that narrowing occurs by eliminating remote consequences, not by requiring a demonstration of fault.

*Brown v. Gardner,* 513 U.S. at 119, 115 S.Ct. 552. It concluded "the text and reasonable inferences from it give a clear answer against the Government, and that, as we have said, is 'the end of the matter.'" 513 U.S. at 120, 115 S.Ct. 552 (citations omitted).

■ Accordingly, the words "as a result of" have an ordinary, contemporary, common meaning. There is no evidence—either in the Act or its legislative history—that Congress intended them here to bear some different import. Thus, the plain language of the statute connotes that if the deprivation of liberty was caused by some prior action of the United States, redress might be obtainable even though the prior legal restraint was removed prior to the time the deprivation was actually suffered. As such, it is far from apparent that the Congress intended that an otherwise eligible individual born an hour or day—or perhaps 33 days—after a specific exclusion order was rescinded would be ineligible for redress even if it were shown that it was practically impossible or at least unreasonably dangerous for a woman in the advanced stage of pregnancy to have traveled so that her child could be born in the family home. Indeed, such an illiberal interpretation of the "as a result of" language in the statute clashes with the overall tenor of the Act and the principle *noscitur a sociis.*[6] The Act, of course, does not merely authorize a garden-variety benefit program, but rather embodies an extraordinary apology for what the Congress clearly viewed as the gravest of violations of "basic civil liberties."[7] Given these circumstances, bureaucratic hair-splitting that would essentially ignore true deprivations of liberty that causally flowed from prior governmental actions is ill-placed.[8] One looking for confirmation of this need go no farther than the 1992 amendment of the Act, in which Congress required the Attorney General to give claimants the "benefit of the doubt" when "there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility." 50 U.S.C. app. § 1898b–4(a).[9] These observations reinforce the construction to which the court is led by the plain meaning of the statutory text.

The eccentricity of the ORA's apparent reading of the statute and regulations in this case is underscored by the fact that the ORA has, in defining other eligibility categories listed in its regulations, construed the phrase "as a result of" consistent with its common

---

6. *Compare Ishida,* 59 F.3d at 1230 ("Basic rules of statutory construction also direct us to read each statutory provision with reference to the whole act."). *See also Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) ("[A] word is known by the company it keeps").

7. It is unclear to what extent defendant's counsel shares this view of the Act. At oral argument, for example, he twice referred to the lifting of the individual exclusion order as a "benevolent act," rationalizing that at the time of the lifting, "the county will still at war with the Empire of Japan." At another point, he argued that redress was inappropriate here because the government "wasn't responsible for [Mrs. Murakami's] pregnancy," and then oddly began tracing dates in what could reasonably be viewed as an attempt to suggest that Mr. Murakami was conceived by his parents out of wedlock (an assertion not supported by the record and, of course, wholly irrelevant to the merits). On remand, the Justice Department may wish to decide whether to associate or disassociate itself from these troubling comments.

8. As Judge Cardozo, in a statement oft-quoted by the Supreme Court, once wrote:

The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced.

*Anderson v. Hayes Construction Co., Inc.,* 243 N.Y. 140, 147, 153 N.E. 28, 29–30 (1926). *See, e.g., Block v. Neal,* 460 U.S. 289, 298, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983) (quoting this statement); *United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 383, 70 S.Ct. 207, 94 L.Ed. 171 (1949) (same).

9. *See Song v. United States,* 43 Fed.Cl. 621, 630 (1999); *Motoyoshi v. United States,* 33 Fed.Cl. 45, 53 (1995) ("[A] construction that gives meaning to the words 'otherwise deprived of liberty' would implement the direction in the 1992 Amendments to give the benefit of the doubt to an individual requesting restitution.").

understanding. Thus, in dealing with property losses suffered by service members, the ORA construed the Act as not requiring that the government directly seized or damaged property, but merely as requiring that the exclusion of an individual from a prohibited zone caused a loss of property. Section 74.3(b)(4) of the regulations thus provides that individuals are deemed to have suffered a loss if "individuals who were members of the Armed Forces of the United States at the time of the evacuation and internment period and whose domicile was in a prohibited zone and as a result of the government action lost property." Commenting on this provision, the preamble to the final regulation explained:

> there were some soldiers who were unable to re-enter unauthorized zones and safeguard their property. Such persons, as well as those whose property was confiscated by the government, could be considered to have been 'deprived of property' as a result of the exclusion policy.

54 Fed. Reg. 34157, 34159 (Aug. 18, 1989). The preamble concluded that "[i]n light of the statutory language of the 1988 Act and the expressed purposes of that Act, such persons may be eligible for redress." *Id.*

Remarkably, then, the ORA appears to have relied on causation theories in allowing for compensation for property lost as the indirect result of government action. Certainly, similar principles of causation ought to apply where more serious deprivations of liberty are involved—after all, under the Act, the "as a result of" language modifies and qualifies the eligibility of both deprivations of liberty and property.[10] While a common rule of construction holds that identical words in different parts of the same statute are presumed to have the same meaning, *see Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 88–89, 55 S.Ct. 50, 79 L.Ed. 211 (1934), one hardly needs a canon to conclude readily that Congress here must have intended a single phrase—"as a result of"—to have the same reach whether referring to a serviceman's property or an infant's liberty. As the ancient Romans once said, *ubi eadem ratio, ibi idem jus*—"where there is the same reason, there is the same law."

Contrary to defendant's claim, this approach is not foreclosed by *Higashi v. United States,* 225 F.3d 1343 (Fed.Cir.2000). In *Higashi,* a Japanese–American born on February 6, 1945, to parents who had been relocated as a result of Executive Order 9066 applied for compensation under the Act. The Federal Circuit held that post-*Ishida* amendment to the regulations, which established a January 20, 1945, cutoff date, was a permissible and reasonable interpretation of the statute. *See Higashi* at 1347. But, in reaching this conclusion, the Federal Circuit relied, notably, on the fact that the regulation also included the catchall provision, thereby leaving open the possibility that individuals might demonstrate that they otherwise had been deprived of liberty. *Higashi,* 225 F.3d at 1347. In particular, in rejecting Higashi's argument that "the cut-off date of January 20, 1945, conflicts with the statutory period extending to June 30, 1946," the court considered it significant that, in an obvious reference to section 74.3(c), "[t]he regulation includes 'individuals otherwise deprived of liberty' after January 29, 1945 among those with entitlement to redress." *Id.*

Skirting this language, defendant asserts that *Higashi* establishes that plaintiff is entitled to redress only if he can demonstrate that he was born before the individual exclusion order on his father was lifted. But, this assertion proves too much. First, the *Higashi* court, in framing the issue before it, clearly recognized that there was not one, but two potential bases on which Higashi could prevail: an extension of the *Ishida* doctrine and the catchall provision in the regulation. Thus, the court stated that if the *Ishida* paragraph in the regulation "properly implements the Act, Ms. Higashi was born after the cut-off date and does not qualify as an 'eligible individual' *unless her eligibility can be established on specific grounds.*" *Higashi* at 1347 (emphasis added). Further-

---

10. *See Ishida,* 59 F.3d at 1230 n. 3 ("The DOJ's policy denying compensation to individuals like Ishida who were deprived of basic liberties as a result of government action is even more unreasonable when one considers that the Act compensates mere property loss"); *see also Song,* 43 Fed.Cl. at 631.

more, the Federal Circuit observed that the ORA had "considered the specific situation of plaintiff's family" and twice noted that this court, beyond finding that Higashi was born after the cut-off date, also considered and found no "constructive" restraint beyond that date. *See Higashi* at 1348. Thus, in affirming the cut-off date in the amended regulation, the Federal Circuit plainly considered the impact of section 74.3(c) of the regulations, which explicitly provides that the regulation's enumerated list of individuals deemed eligible is not exhaustive. And, while that court ultimately concluded that Higashi had failed to show that she was "otherwise deprived of liberty," it did so not based upon the argument that Higashi's parents could not have returned to their home in time for her birth—a review of the briefs in the case reveal that they clearly raised no such argument—but rather based upon this court's finding that public notice of the revocation of the general exclusion order was adequate to remove any "constructive or actual restraint" imposed on Higashi.[11] Accordingly, while it deals with similar subject matter, *Higashi* cannot be viewed as having rejected anything approaching the argument advanced by plaintiff in this case.

Likewise unavailing to defendant is *Kaneko v. United States*, 122 F.3d 1048 (Fed.Cir. 1997), *aff'g*, 36 Fed.Cl. 101 (1996). In that case, the surviving spouse of a Japanese immigrant asserted that she was eligible for monetary redress, pursuant to the Act, for losses allegedly caused by her husband's discharge from a railroad during Word War II. This court rejected this claim, finding that "there was no direct evidence in the form of statutes, regulations, orders, directives, or documents that showed or even indicated that the Federal Government ordered or caused the Southern Pacific Railroad to fire Mr. Kaneko." 36 Fed.Cl. at 109. Ruling this finding to "be undeniably correct," the Federal Circuit affirmed, concluding that "we are constrained by the express terms of the Civil Liberties Act which authorizes redress only for deprivations of liberty or property due to actions taken by or on behalf of the United States, not those taken unilaterally by a private employer such as the Southern Pacific Railroad." 122 F.3d at 1053. Critically, then, the court held that Mr. Kaneko's widow was ineligible for redress because there was no evidence that the federal government played any role whatsoever in his dismissal from the railroad. Accordingly, nothing in *Kaneko* suggests that had there been some causal relationship between the government's actions and the dismissal the same result (*i.e.*, no redress) would have derived.

Under the Act, the Attorney General "shall ... pay out of the Fund to each eligible individual," 50 App. § 1989b–4(1), and "shall identify and locate ... each eligible individual." *Id.* at (2). In the case *sub judice*, it appears that the Attorney General's designee did not fulfill adequately this statutory directive in failing to consider fully whether Mr. Murakami was "otherwise deprived of liberty" within the meaning of the Act and section 74.3(c) of the regulations thereunder. Accordingly, the court concludes that this matter should be remanded to allow that designee to conduct the examination required by the Act and the ORA's regulations. As part of that process, Mr. Murakami should be afforded an opportunity to demonstrate further that his mother was unable to travel to the Los Angeles area, his parent's traditional home, at the point that the individual exclusion order on her husband was rescinded. The court opens no Pandora's jar, but merely seeks to have the Justice Department fully apply the statute as enacted.

## III. CONCLUSION

Mindful of the limitations on this court's review, the court, nonetheless, is obliged to conclude that the ORA's determination is, in some respects, contrary to law, and, at very least, lacking in adequate explanation to allow this court to determine whether the deni-

---

11. It is notable that the Federal Circuit even considered whether there was a "constructive restraint" preventing Ms. Higashi's parents from returning given defendant's vigorous argument in this case that the only thing relevant under the Act is whether a claimant was actually "excluded by law." This portion of the opinion is further indication that defendant's interpretation of *Higashi* relies considerably on the use of blinders.

al was based upon principles that are consistent with the Act. Accordingly, pursuant to 28 U.S.C. § 1491(a)(2) and RCFC 60.1(a), this matter is hereby remanded to the Justice Department for further proceedings leading to a redetermination of plaintiffs' eligibility for redress under the Act and its implementing regulations. The Department shall file a written document incorporating its redetermination of plaintiffs' eligibility with this court on or before October 2, 2002, fully explaining the factual and legal basis for the redetermination. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (agency decision must set forth its rationale with clarity, and must be justifiable on that basis). Defendant shall file status reports indicating the progress of the remand on the following dates: June 3, 2002, and August 2, 2002.

**IT IS SO ORDERED.**